## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TRACY SANDERS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 4:11-cv-0397-JEO** |
| | ) | |
| **BENJAMIN MOORE & CO.,** | ) | |
| **PAINTS,** *a business or corporation*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Tracy Sanders, an African American, asserts claims against her former employer, Benjamin Moore & Co. ("Benjamin Moore"), for racial discrimination and retaliation pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq*. ("Title VII"); interference and retaliation pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"); a retaliatory hostile work environment pursuant to Title VII, § 1981, the FMLA, and the Occupational Safety and Health Act of 1970, 84 Stat. 1590, as amended, 29 U.S.C. § 651 *et seq.*; and a supplemental state-law claim, asserted under 28 U.S.C. § 1367, for negligent or wanton supervision.[1]

Benjamin Moore asserts counterclaims against plaintiff for constructive trust,

---

[1] *See* doc. no. 37 (Third Amended Complaint).

equitable lien, restitution, equitable offset, or other equitable relief pursuant to 29 U.S.C. § 1132(a)(3); unjust enrichment pursuant to federal common law; and attorneys fees and costs pursuant to 29 U.S.C. § 1132(g).

The case currently is before the court on Benjamin Moore's motion for summary judgment on all claims, including its counterclaims,[2] and motion to strike plaintiff's evidentiary submission in opposition to summary judgment.[3]   Upon consideration of the pleadings, briefs, and evidentiary submissions, this court concludes that the motion to strike is due to be denied, and the motion for summary judgment is due to be granted, but only in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[2] Doc. no. 64.

[3] Doc. no. 76.

2

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS[4]

Benjamin Moore is a national manufacturer and retailer of high-quality paints and coatings,[5] operating five paint manufacturing facilities in the United States and one manufacturing facility in Canada.[6]   The company maintains an Equal Employment Opportunity Policy and a zero tolerance harassment and retaliation policy,[7] as well as an ADA policy which requires employees who wish to make a request for accommodation to cooperate with Human Resources in arriving upon a reasonable accommodation.[8]  At all relevant times, Elizabeth Edwards, an African American, was Benjamin Moore's Human Resources Director.[9]

Benjamin Moore hired plaintiff on October 8, 2007, as a Controls Engineer at its Pell City, Alabama facility.[10]  The Benjamin Moore Manufacturing Payroll Authorization Request Form indicated that plaintiff was originally scheduled 86.67

---

[4] The following statements are the "facts" for summary judgment purposes only, and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).  All reasonable doubts have been resolved in favor of plaintiff, the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

[5] Doc. no. 66-20 (Recca Declaration), ¶ 3.  Dennis Recca was Benjamin Moore's Lead Engineer.  *Id.* ¶ 1.

[6] Doc. no. 66-7 (Recca Deposition), at 11-12.

[7] Doc. no. 66-21 (Edwards Declaration), ¶¶ 3-4; 9-10.  Liz Edwards is an African American and Benjamin Moore's Director of Human Resources.  *Id.* ¶ 1.

[8] *Id.* ¶¶ 5-6.

[9] Doc. no. 66-10 (Edwards Deposition), at 5.

[10] Doc. no. 66-1 (Plaintiff Deposition), at 21, 37-38.

4

hours per every semi-monthly pay cycle, with no other hours listed.[11]  On-call duties were not in plaintiff's original job description.[12]

At the time of plaintiff's hire, there were four other engineers working in the "Controls Group," a subset of Benjamin Moore's Engineering Department.[13]  Plaintiff was the only engineer at the Pell City facility,[14] and her primary responsibility was to program controls that affected the dispensing of paint into Benjamin Moore's manufacturing system.[15]  As a Controls Engineer, plaintiff did not have to be physically present at the plant to perform her job.[16]  She initially reported to the Engineering Department Manager, Art Mengon.[17]  Mengon permitted plaintiff to work under a Flexible Work Arrangement ("FWA"), whereby plaintiff could work

---

[11] Doc. no. 66-12 (Exhibits to Pallozzi Deposition), at ECF 23.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[12] Doc. no. 66-1 (Plaintiff Deposition), at 73.

[13] Doc. no. 66-1 (Plaintiff Deposition), at 74, 77-78, 91, 96.

[14] *Id.* at 31.

[15] Doc. no. 66-20 (Recca Declaration), at 2-3, ¶ 8.

[16] Doc. no. 66-1 (Plaintiff Deposition), at 94-95; doc. no. 66-7 (Recca Deposition), at 23.

[17] Doc. no. 66-1 (Plaintiff Deposition), at 38.

from home at all times.[18]

At the beginning of 2008, plaintiff received an overall performance rating of "3 - Meeting All Expectations" in her 2007 Performance Review Form, and Mengon noted that plaintiff had "[g]ood, positive feedback regarding [her] interactions with others," and that "[p]ersonal observations, as well as from limited feedback, indicate [plaintiff] will be a solid addition to our electrical & controls group.  While her short time with us in 2007 was too brief to substantially impact the business, her preparation has been as expected to contribute significantly through the next year."[19]

At some point in 2008, Art Mengon left Benjamin Moore, and Jesse Singh became plaintiff's direct manager.[20]  Thereafter, Benjamin Moore experienced a significant downturn in business, forcing the company to implement a reduction-in-force ("RIF").[21]  Some employees left Benjamin Moore, and the company terminated others, resulting in the Controls Group being reduced to one Controls Engineer — plaintiff.[22]  Plaintiff volunteered to take on additional work "because there was no one else to do the work."[23]  Her role expanded to include project management, system

---

[18] Doc. no. 66-21 (Edwards Declaration), at 3, ¶ 9.  Under a FWA, an employee may be permitted to work offsite during agreed hours, under certain management imposed conditions.  *Id.*

[19] Doc. no. 66-12 (Exhibits to Pallozzi Deposition), at ECF 32-36.

[20] Doc. no. 66-1 (Plaintiff Deposition), at 95.

[21] Doc. no. 66-10 (Edwards Deposition), at 14.

[22] Doc. no. 66-10 (Edwards Deposition), at 14.

[23] Doc. no. 66-1 (Plaintiff Deposition), at 48.

back-ups, contractor and automation file management, and automation support programming.[24]   Benjamin Moore also required plaintiff to provide 24/7 on-call, after-hours support for all of the company's facilities.[25]   Essentially, this meant that in the event that production lines malfunctioned at any of the five manufacturing facilities, plaintiff was required to be available to resolve problems remotely.[26]   Most after-hours emergency calls were resolved quickly by Gideon John, an IT employee, because they involved first-level IT technical support, but plaintiff was responsible for more technical malfunctions that could not be resolved by John.[27]   Plaintiff was the only engineer to provide on-call support after the RIF because she was the only controls engineer, and process engineers did not support plant equipment.[28]

At the beginning of 2009, plaintiff received an overall performance rating of "3 - Meeting All Expectations" in her 2008 Performance Review Form, and Singh noted that plaintiff had "cordial rapport and positive demeanor within the Engineering group and those within Pell City and Mesquite," that she was "an individual with initiative and drive," and that Singh expected Benjamin Moore to recognize plaintiff

---

[24] Doc. no. 66-7 (Growth Form), at ECF 28-36; doc. no. 66-12 (Exhibits to Pallozzi Deposition), at ECF 32-36.

[25] *Id.* at 73-77, 99.

[26] *Id.* at 83.

[27] Doc. no. 66-16 (Yama Deposition), at 31-33.

[28] Doc. no. 66-1 (Plaintiff Deposition), at 74-75, 85-86, 112.

7

"as our controls expert and will seek [her] involvement in project work, troubleshooting plant issues and providing direction for our controls opportunities looking to our future."[29]   Joseph Dotzman, a Caucasian and Benjamin Moore's Manufacturing Director, included the following comments in plaintiff's 2008 Performance Review:

> The year end review for [plaintiff] highlights some issues around communication that are valid in her assessment.  However, since Jessie did not supervise [plaintiff] for the whole year, the review is not as encompassing as it could be. [Plaintiff] did help with tasks outside of her original job scope in the last quarter of 2008 when the department shrank unexpectedly down to a single controls person — herself.  Most Benjamin Moore employees were tasked with doing more during 2008 as reductions in force and cost saving initiatives compelled us to multi-task and be more productive as employees. On paper and in limited practice, [plaintiff] took on more than her role originally called, but she did show some weaknesses in communication and working with others that need to be addressed regardless of how many extra duties she performs.   These weaknesses are in areas of basic expectations of teamwork and project management.  That said, discussions I have held with manufacturing managers, engineers, and other associated Benjamin Moore personnel have satisfied me that the critiques outlined by Jessie are accurate and also that the rating of "3 - Meets All Expectations" is appropriate. Now that [plaintiff] has had more time within the Benjamin Moore culture, those expectations will certainly be raised for 2009.  I expect [plaintiff] to accept the critiques offered by Jessie and to work on those areas of improvement so that she continues to meet, and hopefully exceed, expectations in the year to come.

Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 38.  Plaintiff added the following comments to her 2008 performance review:

---

[29] Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 34-39.

I feel that engineering leadership strives to cultivate negativity through its performance management system (without factual examples to support their opinion). The communication weakness that Joe mentioned, "must be addressed," stems from one plant's version of a 1:00 am automation support phone call. This call (12/08) was not, subsequently, discussed with me until my review (2/09) and no other supporting examples were discussed with me during the year. This was also pointed out by my HR business partner. Also, there were no specific or defined communication goals given to evaluate me against. Therefore, true or not, can one incident be fairly used to evaluate an entire year of performance?

My previous manager, Art Mengon, repeatedly, communicated a vision and strategy for controls, and evaluated me based on specific goals and measures. He, effectively, used the performance management system by, constructively, pointing out things to improve upon but he also highlighted superior performance. In my 2007 performance review, Art stated: "Good, positive feedback regarding your interactions with others." However, the current management team sought out and reviewed with me negative information but made no reference to my performance on projects that were successfully completed by me that met customer requirements.

Joe stated that he is "not sure" how I am doing in the controls group but monthly progress reports were submitted by me and he participated in project review meetings where my projects were discussed. Therefore, how can he believe that Jessie's original assessment of me was accurate when he stated that he was "not sure" how I was doing in controls? His statement, also, was not substantiated by HR because if their investigation had not yielded evidence to the contrary, there would not have been a basis for assigning me to another manager or re-writing my 2008 performance review.

In conclusion, the performance management system is not used, correctly, by current management; it reflects a defensive approach and negative overtures. Instead, it should represent an assessment against specific measurable, actionable, reasonable, time bound goals that are

9

established at the beginning of the year.  Otherwise, they can continue to do, exactly, they have done here, arbitrarily, select things that were not included in your goals at the beginning of the year and/or evaluate you against tasks that you did not know you were going to be evaluated against.  I started automation support in August, how was it ever included in my goals at the beginning of 2008?  Thank you.

*Id.* at ECF 38-39.

In April 2009, the following email correspondence occurred between plaintiff,

Singh, and Dotzman:

> **From:** Singh, Jessie
> **Sent:** Wednesday, April 08, 2009 12:55 PM
> **To:** Sanders, Tracy
> **Subject:** Monthly Catch-up
>
> Hi Tracy,
>
> I included a few talking points for our monthly catch-up. You can certainly additional [*sic*] agenda items as well.  I need to return a phone call so I will call you at 2:15.
>
> Thanks,
>
> Jessie
>
> . . .
>
> **From:** Sanders, Tracy
> **Sent:** Thursday, April 09, 2009 9:46 AM
> **To:** Singh, Jessie
> **Cc:** Dotzman, Joseph; Eiler, Susan
> **Subject:** RE: Monthly Catch-up - Personnel Issue - CONFIDENTIAL
> **Importance:** High

Jessie,

We will have to schedule our meeting after the Dallas start up because I am covered up right now and my time is very limited.  I can not begin to address the items that you want to discuss until I finish this start up which requires my full attention. However, I really did not expect you to call because time and time again, you have shown no respect for my time by setting up conference calls with me and then you never call. You said, during my evaluation (2/6/09) that we were going to have weekly calls but you have never called. In fact, you do not return my phone calls or e-mails. You told me that you wanted to come to Dallas for the FAT but when I sent you and Kevin an e-mail asking you both to confirm your attendance, you did not reply, consequently, Kevin replied and he came, you did not. Just like you have expectation [*sic*] of me, I have expectations of you as my manager.

I gave you a list of controls items that I felt we need to focus on and also automation support strategic diagrams that you have not responded back to me on. You, also, were suppose to attend our first automation support conference call with IT and you did not but you always send an excuse e-mail to explain. However, I cannot continue to excuse this kind of behavior anymore because it is very disrespectful and on top of this you presented me with a negative evaluation. I, sincerely, took it upon myself to volunteer to help out during this difficult period, although it has now turned into me taking on the responsibilities of three other engineers with no admin or drafting support. I have given up my personal time to be on call 24/7 by the plants; I work weekends doing backups and project start ups and I feel that none of my efforts are being appreciated. I have accomplished a significant amount of work for BM, however, it is disturbing that although I am reaching far beyond my job duties to keep us afloat, I can not be rated a (4). Something is very wrong with this picture, I am requesting that someone explain to me what it takes to be rated a (4) because, clearly, it not [*sic*] obtained by performing over and above the capacity of your own job functions or by saving engineering thousands of dollars by preventing PLC over writing, which is monumental in itself but your only focus is plant support.

11

As I explained to you, it is appalling that my review consisted, mainly, about two one-sided conversations: 1) one plant's feedback (when I service them all) during a 1:00 am, call where I offered my support but the operator could not do the things that I was telling him to do and he constantly put me on hold, I continued to follow up on the situation and 2) [m]y contact with IT over providing me a loaner laptop (my laptop was being serviced) where I expressed my frustrated (sic) in that IT send [*sic*] me a loaner without a CD Rom drive, therefore, I could not load any of my applications that I use to provide plant support. I feel that when you found out about this, you should have addressed this issue with IT to ensure that I have what I need to adequately support the plants while my laptop is being serviced, this issue still requires addressing. I expect you to address your concerns with me, not just present them to me in my evaluation. I was evaluated based on Peter's job description, not mine, none of my project work was even mentioned, although, I have sent you progress reports, updating you about them. I am assuming that since you have a very limited knowledge of controls and my job functions, it makes you look better by showing me in a negative light. Although you agreed to modify my 2008 year end review on 2/6/09, it has not transpired, you sent an e-mail three weeks ago on a Friday informing me that it would be updated, the following Monday, but nothing has been done to date, this is unacceptable.

**Joe:** I have tried not to say anything and I do not mean any harm but it is not in the best interest of my professional career, our department or Benjamin Moore, as a whole, not to address and resolve this. I require a manager who has knowledge of electrical/controls and a vision and strategy for its future, someone who can evaluate me based on my specific job description and is objective and fair. I deserve a manager who is interested in my career development and not one who looks for ways to tear it down and I, certainly, expect my phone calls and e-mail to be returned. I should not have to continue to contend with this kind of unprofessionalism. I am not sure if it is just me or if she treats her other direct reports in this manner, but this working relationship is not working out. I know that the two of you work very closely together and it may be difficult for you to be objective in this matter but, clearly, something needs to be done to resolve it. Therefore, I am requesting that

12

my 2008 evaluation be modified to reflect the tasks as described in my specific job description and that I be managed by you. Jessie's actions do not serve to cultivate a successful working relationship between the two of us. Perhaps you or Sue will get back to me concerning how we will proceed on this matter.

Regards,

Tracy Jones-Sanders

. . .

**From:** Dotzman, Joseph
**Sent:** Thursday, April 09, 2009 11:22 AM
**To:** Sanders, Tracy
**Cc:** Eiler, Susan; Singh, Jessie
**Subject:** RE: Monthly Catch-up - Personnel Issue - CONFIDENTIAL

Tracy,

There is obviously a major rift here that requires attention. Because I am going on vacation next week, I would like to have a phone conversation tomorrow with yourself and Sue on the line to discuss this matter. We can establish next steps during that call.

Although there is obviously frustration on your part, I would ask that you refrain from sending messages such as those below, and instead work with your HR business partner, Sue Eiler, or call your manager directly. If things are as broken as you say, then you must discuss it with your manager before sending out an email such as you have below. Concerns, accusations, and conjecture, particularly those made with a confrontational approach that cast your manager in a negative light only serve to hurt your credibility. I am not taking sides nor am I making any judgments about who is right and who is wrong at this point, I am just stating that this type of impasse is not well served by emailing a broad audience.

I will send out a meeting invite shortly.

Regards,

Joe

. . .

**From:** Sanders, Tracy
**Sent:** Thursday, April 09, 2009 12:59 PM
**To:** Dotzman, Joseph
**Cc:** Eiler, Susan
**Subject:** RE: Monthly catch-up· Personnel Issue ·CONFIDENTIAL
**Importance:** High

Joe,

I understand your point about calling her directly but why bother when you know that she does not answer or return your calls. I am sorry that you feel that this is a confrontational approach but it is not it is simply the truth and there is no other way to sugar coat it I felt that I was addressing this issue with the same persons that she cast a negative light on me with and that's you and Sue. I felt that the two of you should be copied on escalated issues but I apologize if you disagree, however, if you prefer in the future, I will only contact Sue. Again, I mean no harm but something has to be done. I look forward to talking with you and Sue, tomorrow.

Thanks,

Tracy Jones-Sanders

. . .

**From:** Dotzman, Joseph
**Sent:** Thursday, April 09, 2009 12:31 PM
**To:** Sanders, Tracy

**Cc:** Eller, Susan
**Subject:** RE: Monthly Catch-up· Personnel Issue - CONFIDENTIAL

I understand. We'll talk tomorrow.

Thanks,

Joe

Doc. no. 66-12 (Exhibits to Pallozzi Deposition), at ECF 38-41.[30]  Later that

month, Theresa Pallozzi, a Caucasian Human Resources Business Partner, was

assigned to handle the HR functions of the Controls Group, which, at the time, still

only contained plaintiff.[31]

In May 2009, plaintiff began reporting to Dennis Recca, Benjamin Moore's

Lead Engineer.[32]  Recca, who was based in Flanders, New Jersey, managed the entire

Engineering Department and was responsible for operations at all six of Benjamin

Moore's manufacturing facilities.[33]  Recca did not get involved in the day-to-day

operations that plaintiff performed, but he did attend weekly telephonic meetings with

---

[30] These emails were originally part of a chain.  They have been rearranged in chronological order.

[31] Doc. no. 66-12 (Pallozi Deposition), at 20-21; doc. no. 66-10 (Edwards Deposition), at 6-7; doc. no. 66-7 (Recca Deposition), at 13.  It appears that Susan Eiler, whom plaintiff included in the previous email correspondence, was assigned to handle the HR functions of the Controls Group prior to Pallozzi.

[32] Doc. no. 66-1 (Plaintiff Deposition), at 82-83.

[33] Doc. no. 66-20 (Recca Declaration), at 1-2, ¶¶ 2, 5; doc. no. 66-7 (Recca Deposition), at 10.

plaintiff, and did periodic monthly updates for project progress.[34]  Recca also required

all engineers he supervised to keep an updated calendar regarding the projects

assigned, except when the employee was in attendance at their regular work location,

and he regularly reviewed employee calendars.[35]  Recca often reviewed plaintiff's

calendar entries and found that plaintiff did not include her daily projects on her

calendar for the times she worked from home.[36]  As a result, Recca emailed plaintiff

multiple times and requested that she update her calendar to include the projects she

was working on from home.[37]  For example, Recca sent plaintiff the following email

on June 15, 2009:

> Tracy,
>
> The point of calendar entries is to reflect as close as possible your WFH
> work schedule.  You have just duplicated the same itinerary on every
> planned WFH day including over your vacation.  Your calendar does
> reflect the full 8 hour schedule as we have discussed but it should vary
> each week depending on your priorities.  At the end of your WFH day
> you may need to take a few minutes to rebalance time on your calendar
> based on actual an [*sic*] add some details.
>
> For example, on June 10 what files were actually backed up 12:30 to
> 3:30 Backed up Jtown, C&C, Pell City Cell 1 etc 3:30 to 4pm Trouble
> shoot Milford tank level.

---

[34] Doc. no. 66-7 (Recca Deposition), at 28-30.

[35] Doc. no. 66-7 (Recca Deposition), at 33, 45; doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 10.

[36] Doc. no. 66-20 (Recca Declaration), ¶ 24.

[37] *Id.*

During my next visit I'd like to review the back-up process so we can explore ways to streamline process.

If you have any questions call to discuss.

J. Dennis Recca, P.E.

Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 20.

Plaintiff sent the following email to Edwards and Pallozzi on June 29, 2009:

Liz,

I hope that you are doing well. However, on 6/26/09, Dennis Recca informed me of management's decision to deny me the continuance of my FWA on the bases that Joe Dotzman said, "no one in Supply Chain will be allowed to work from home." With this in mind and the fact that the primary location where I provide after hour support is from my home, this decision only serves to put our level of production in jeopardy. With most facilities operating on three shifts, they require 24/7 support, therefore, I am appalled that management would even consider taking away the tools and the flexibility necessary to provide this coverage. Week before last, I was told that they will no longer continue to pay for the internet service that I use to provide after hour support but after I explained the fact that we have been tasked to reduce cost and that our only other option is to rely on outside contractors with overtime rates in excess of $250.00/hour (plus a monthly service contract charge per facility and travel expenses), they told me (on Friday) that they will pay for my internet through the end of the year but as of July 1, 2009, no one in Supply Chain will be allowed to work from home.

After almost two years of telecommuting, volunteering to take on extra work responsibilities and actually getting things done, management response has been to seek out and present negative information through the misuse of the performance management system and, now, take away

17

the tools that I need to perform my job (internet and FWA). Therefore, given the above and the negative comments that Joe made in the rewrite of my 2008 review, I feel that it is more important to him to retaliate against me for the HR issue that I raised (concerning Jessie) than to provide the necessary services to sustain BM's production operations. What will they seek to do next, take away my office or even get rid of me? Is this what I can continue to expect while working for BM? Will BM allow the performance system to be misused and allow retribution for issues raised? This is not right! I, certainly, hope that we can turn things around, navigate away from the negatives and the drive to seek out hurtful actions against me? I hope we can put this behind us and place the importance of BM's production goals into focus.

Although I volunteered for this supposedly, temporary, assignment, it bas been a sacrifice for me to cover (5) plants, allowing support issues to interfere with my personal time, but I realize the high dependence of production to controls, if our automation equipment is down, so is our ability to produce paint, so I respond at 2:00 am or anytime. However, now that they have said "no one can work from home," it is unfair to say that I can work from home after I leave the office but can not work from home during regular business hours as I have been since coming to work for BM. To me this policy mean, [sic] no one can work from home, during regular business hours and non-business hours. Also, it is unrealistic for me to work regular hours then work at 3:00 am or set up to assist with a 6:00 am service call and then be required to report back into the office at 7:00 am. How can I provide the level of "on demand" 24/7 service, get some rest and meet my family obligations?

The IT department allows flexibility for those who provide 24/7 support due to the nature of their job. How can Joe make a blanket statement that "no one in Supply Chain can work from home," without addressing the nature of responsibilities per an individual's job requirement? I work with Gideon Johns of IT and many times we work into the "wee" hours of the night on problems, however, he can balance out his hours by working from home going into the office late but now, all of a sudden, I can't.

I also noticed that the FWA documentation does not say that there must be a special circumstance to telecommute or that Supply chain is not eligible. Per the, recent, memo that discussed the closing of the Edgewater facility, it stated that some will work virtually without reference to this supply Chain policy that was only discussed with me. This new policy was not discussed with all of Supply Chain as a group, it was only told to me, by Dennis, as the bases for denying my FWA.

In my opinion, this level of support service should be formally incorporated into my duties (with appropriate compensation) and all of the necessary tools be provided or management should move forward with establishing service contract agreements with appropriate contractors and provide the plant(s) instruction and contact information. At this time, I do not understand what they want or expect of me, but I do know that management must, immediately and realistically, address how the plants will receive the support that three shift operations demand.

I am currently on vacation and will return on 7/6/09, but perhaps you can begin to address the issue of negativity, now, directed towards me, the unwarranted denial of my FWA, and as well as, help me to understand what is, realistically, expected of me. . . .

Kind regards,

Tracy Jones-Sanders, EE

Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 14-16.

On July 22, 2009, plaintiff complained internally with Benjamin Moore's Human Resources Department that she was being harassed by her manager, Recca.[38] Plaintiff contended that Recca harassed her by isolating her and leaving her out of important, imperative communications and project meetings, and putting her under

---

[38] Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 11.

heightened scrutiny.[39]  Specifically, Recca did not communicate with plaintiff, and instead talked to the plant maintenance manager at the Pell City facility about project statuses as though he were the Controls Engineer, although he did talk to the Caucasian engineers that were in New Jersey.[40]  In response to the question, "What made you believe that [the harassment] was because of your race," plaintiff answered:

> What caused me to believe it was because of my race was when — when — it got to be back to back.  It got to be harassing.  It got to be one thing after the other.  He's complaining about this.  Instead of helping me get the help that I need to do my job, he's taking up my time on the phone for hours and hours with me explaining the same thing to him over and over again.  Or he has me in weekly meetings where no one else — none of the white engineers that I know of are in weekly meetings with their manager, you know, because of the way that he handled communications with me.

Doc. no. 66-1 (Plaintiff Deposition), at 117-18.  Plaintiff noted that she was never subjected to any racial epithets or racially derogatory statements.[41]

Plaintiff also frequently complained about her workload, asking Recca if other employees could assist her.[42]  To accommodate those complaints, Human Resources adjusted plaintiff's on-call schedule.[43]  Beginning August 3, 2009, plaintiff was only

---

[39] Doc. no. 66-1 (Plaintiff Deposition), at 114-115.

[40] *Id.* at 129-30.

[41] *Id.* at 114.

[42] Doc. no. 66-1 (Plaintiff Deposition), at 102-04.

[43] Doc. no. 66-10 (Edwards Deposition), at 35; doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 4.

required to provide on-call, after-hours support from Monday at 6 a.m. until Friday at 5 p.m., and plaintiff was not required to provide support during prescheduled vacation or personal days.[44]  Additionally, plaintiff was granted a new FWA, which allowed her to work from home on Wednesdays.[45]  Under the new FWA, however, plaintiff was required to provide a detailed calendar listing of the projects and tasks that she worked on daily, and she was advised that the arrangement would be periodically reviewed to ensure its effectiveness.[46]

Plaintiff applied for the position of Senior Controls Engineer at Benjamin Moore on August 10, 2009.[47]  The position was based in Flanders, New Jersey, and the Senior Controls Engineer would be responsible for troubleshooting, eliminating control systems issues, managing controls projects, developing and maintaining process system databases, developing new control and monitoring systems, and other

---

[44] Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 4.

[45] Id.; doc. no. 66-1 (Plaintiff Deposition), at 105.  Recca had requested that employees submit a form to continue any FWA.  Doc. no. 66-1 (Plaintiff Deposition), at 109-110.

[46] Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 4.  Plaintiff disputes this fact based on a letter Recca sent her stating: "When in attendance at your regular work location no entry required."  Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 10.  This letter, however, was sent months before the new FWA was granted, and the new FWA explicitly required plaintiff "to get a detailed calendar listing of the projects and tasks being worked on."  Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 10.

[47] Doc. no. 66-20 (Recca Declaration), ¶ 27. Plaintiff helped prepare the job description for this position in September of 2008, and provided it to Jessie Singh and Joseph Dotzman.  Doc. no. 66-2 (Plaintiff Deposition), at 294.  The position was posted on June 4, 2009.  Doc. no. 66-20 (Recca Declaration), ¶ 26.

controls functions.[48]  The job posting listed the following required qualifications for

the position:

- BS degree in Electrical Engineering Technology, or equivalent experience.
- Minimum of ten years experience in process Senior Controls Engineering process support and project management, preferably from a liquid products industry (paint, food, beverage, household product, cosmetic, and pharmaceutical).
- Will have the ability to collaboratively analyze and evaluate controls and automation systems, and to work with operating and corporate personnel to implement changes in systems, equipment, and procedures that result in operational improvement.
- The Senior Controls Engineer must have an understanding of PLC architecture and have experience writing functional requirements and specifications.  Must have the ability to create and modify PLC ladder logic.  Must be able to integrate instrumentation, vision systems, bar code scanners, servo motors, stepper motors, and multi-axis robots into control systems.
- The Senior Controls Engineer will have PLC and high level language programming skills, i.e. Visual Basic, C/C++.
- The Senior Controls Engineer must have strong interpersonal, communication, presentation, writing, project management, negotiation, influence, teamwork, analytical and decision-making skills, as well as a strong attention to detail.
- Strong computer literacy with significant experience in MS Office, including Microsoft Project.  Must be able to develop P&ID's and other support drawings utilizing AutoCAD / AutoCAD Lite.
- Requires frequent travel.
- In depth knowledge of the requirements of NEC, IEC, NFPA and other relevant codes as they apply to controls systems.

Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 37-38.

---

[48] Doc. no. 66-20 (Recca Declaration), ¶¶ 26, 27.

In August of 2009, plaintiff told Edwards that she would no longer communicate with Recca directly, and would only communicate with him through voicemail or email.[49] According to Recca, communications between him and plaintiff became strained.[50] As a result, Pallozzi began attending weekly telephonic meetings between plaintiff and Recca to help assess the communication issues.[51] On August 24, 2009, the following email correspondence occurred between plaintiff and Pallozzi:

> **From:** Pallozzi, Terry
> **Sent:** Monday, August 24, 2009 9:45 AM
> **To:** Sanders, Tracy
> **Subject:** Feedback
>
> Hi Tracy,
>
> Do you have a few moments for me this Wednesday so that I can provide you some of the feedback from our meeting last week. Let me know.
> Thanks
> Terry
>
> . . .
>
> **From:** Sanders, Tracy
> **Sent:** Monday, August 24, 2009 1:06 PM
> **To:** Pallozzi, Terry

---

[49] Doc. no. 66-1 (Plaintiff Deposition), at 116-17.

[50] Doc. no. 66-20 (Recca Declaration), ¶ 22.

[51] Doc. no. 66-1 (Plaintiff Deposition), at 136.  Edwards telephonically attended one of the meetings.

23

**Subject:** RE: Feedback

Terry,

Yes, I will make myself available and thank you for sitting in on the call. However, you expressed your frustration and discontent with how our conversation went. As you can see, phone conversations with Dennis can last for hours going over the same material that has already been discussed and explained to him before, even in writing. Now, couple that conversation with him delivering messages of about what they are going to take away from, (i.e. the internet, FWA, *56 hours of comp time), pressuring me for dates, adding more tasks instead of offering to relieve me, along with sarcastic comments about me and after hour support and telling me that that [*sic*] Art is not here anymore, etc., then multiply it by several conversations, during a short time span, and it is enough to raise anyone's stress level. These kind of engagements only serve to hinder me from doing my work, create a hostile working environment and nothing really gets accomplished.

Thursday's agenda was suppose to cover four points but we never made it past the first one in a hour and a half. I asked another engineer how he handles discussions with Dennis and he said "I bang my head against the wall . . . ," he said that he tries to avoid them as much as possible because it is stressful and he told me not to allow it to stress me.  Does BM offer any training to individuals whom they place in management positions?  As a new employee, within the span of about a year and a half, I lost a good manager and have been subjected, to-date, to three other individuals and out of the three of them, I see no evidence of managerial skill or expertise.  This is not good for BM, I have gone from one extreme to the other, one manager who did not communicate at all to one who propels me into vicious cycles of conversation where I am forced to repeat myself while no work gets done. At some point, something has to give, meaning that HR or higher management has to stop and take a hard look at things and make some decisions and adjustments that work for the betterment our department which continues to deteriorate.

Please do not take this e-mail as anything more that constructive, with the aim of seeing that things get better because only if it's brought to your attention is there even a remote chance of something being done about it. At the end of the call, I noted that you said that we were free to talk outside of this forum, therefore, I must reiterate that I am abiding by doctor's directive to minimize stress and handle conversations with him through a third party.  I have put in a call to my doctor so that he can address his comments, directly, to my supervision. Also, in the event that you are not available to attend the weekly call, please have Dennis to reschedule.

Warmest regards,

Tracy Jones-Sanders

. . .

**From:** Pallozzi, Terry
**Sent:** Monday, August 24, 2009 2:58 PM
**To:** Sanders, Tracy
**Subject:** RE: Feedback

Let's plan to talk on Wednesday. I will send you a meeting request
Terry

Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 7-8.[52]  Three days later,

plaintiff sent the following email to Pallozzi:

| **From:** | Sanders, Tracy |
|---|---|
| **Sent:** | Thursday, August 27, 2009 7:53 AM |
| **To:** | Pallozzi, Terry |
| **Subject:** | Follow Up |
| **Importance:** | High |

---

[52] These emails were originally part of a chain.  They have been rearranged in chronological order.

**Tracking:**     **Recipient**     **Read**
                  Pallozzi, Terry   Read: 8/27/2009 8:04 AM

Terry,

I tried to reach this [*sic*] morning as a follow up to our conversation. What I am hearing is that you are seeking cast [*sic*] me as insubordinate. That was the most dominate [*sic*] word that you used on yesterday. It is as if it is being used as a form of entrapment because if I do not say anything, I am insubordinate and if I say something, I am frustrated, harsh and insubordinate, and subsequently, you will put this in writing and in my file. Therefore, if your participation on the calls is to threaten and document me as insubordinate and disable (telling me that I need to contact Atena [*sic*] about getting short term disability if I do not feel that I can do my job), then this is not what I signed up for.

I was under the impression that we were working through some difficulties where you knew that was frustration and defensiveness (because of what my department was trying to take away from me/my evaluation, etc) involved. However, if I can not work through this without the threat of being written up as insubordinate, then we need to approach this different way. It is **not** **my** **intent** to be **insubordinate**, again, I sincerely sought to help out my department with a strong drive to do as much as I could and with a willing attitude, but that is not what is being documented, here. You are seeking to document anything that you can term insubordinate which, to me, does little towards accomplishing positive results; it only further deteriorates the situation.

Thank you for listening.

Regards,

Tracy Jones-Sanders

Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 9 (emphasis in original).

Plaintiff informed Recca that she had applied for the Senior Controls Engineer

position on September 4, 2009.[53]

On October 21, 2009, the following email correspondence occurred between

plaintiff and Recca (with Pallozzi attached as a recipient):

**From:** Recca, Dennis
**To:** Sanders, Tracy
**Cc:** Pallozzi, Terry
**Sent:** Wed Oct 21 13:51:24 2009
**Subject:** Travel Expenses

Tracy

As a follow-up to our discussion on your recent expense submittal I would refer you to the BM HR - Travel Expense Guidelines which can be found via the Employee Online Handbook. Please take note under business meals that you must account for meals with others under entertainment and document as outlined.  The travel guideline also only authorizes car rentals up to "mid-size'. [*sic*] Please confirm if the rental charges on your expense request was for two or three days and what the car category was. I recommend you take the time to read through the entire guide at this time.

I'm sorry you felt troubled with my questioning your expense form because no one else had before.  BM has requested that we all be mindful of managing our expenses and I expect that you would consider my suggestions when making future travel arrangements and expenditures. I will return your expense request so you can make the necessary corrections.

Dennis

. . .

---

[53] Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 28.

27

**From:** Sanders, Tracy
**Sent:** Wednesday, October 21, 2009 4:03 PM
**To:** Recca, Dennis
**Cc:** Pallozzi, Terry
**Subject:** Re: Travel Expenses

Dennis,

I do not have a problem with you questioning me about my expense report because I understand the points that you made and will make the appropriate changes. However, the issue is that you routinely question me about everything that I do, everything! It is to the point that when someone e-mails me and copies you, I can't respond to them for you e-mailing or calling me about it to explain. You question me all the time about support issues, about Controls, about other things and now questions about my expenses. It is questions, questions, questions. I find myself explaining and explaining and explaining then explaining things over again. I have never experienced this level of questioning from any manager and I would like to understand why.

I understand that your knowledge is limited when it comes to Controls but I do not expect to be barraged with questions all the time until it affects my work output. The time that I spend e-mailing or explaining over the phone, I could have accomplished more of my work. Today, you even questioned if I used the kitchen in the suite that always [*sic*] use in Dallas, I find that quite excessive, then you came across like I was on a witness stand.

Believe me, I do not mind people asking questions but this has become so routine and excessive that you may not be aware of it, I certainly hope that you are not doing it on purpose, but what ever the reason, I hope that you will be mindful and curtail the questioning so that I can perform my job.

Thank you,

Tracy Jones-Sanders

28

. . .

**From:** Recca, Dennis
**To:** Sanders, Tracy
**Cc:** Pallozzi, Terry
**Sent:** Wed Oct 21 17:38:23 2009
**Subject:** RE: Travel Expenses

Tracy

I believe your characterization of the few times I have asked for clarifications on technical issues is overly dramatized. I provide you with the same level of guidance and questions that I do for others that report to me. It appears that every time we have a discussion about administrative issues that conflict with the way you want things we have this kind of response. I would like us to spend time reviewing this with Terry tomorrow.

Dennis

. . .

**From:** Sanders, Tracy
**Sent:** Wednesday, October 21, 2009 6:42 PM
**To:** Recca, Dennis
**Cc:** Pallozzi, Terry
**Subject:** Re: Travel Expenses

There are questions all the time then more when we talk on Thursdays. Things do not have to be like I want them but you do not want to accept my ideas or suggestions in Controls or Admin which is why I am excluded from Controls related meetings, etc.

You only seem interested in asserting your authority and making sure that I make no decisions or have any control so you ask contractors and everybody else about projects to learn enough to base your decision.

29

Like I ask you before, why have Controls staff if you are not going respect their knowledge?

I have said all that I have to say on this subject because this a sensitive area that provokes argument, however, if you want to discuss this with Terry, you can. I will have no further comments on this subject during our meeting.

Thanks.

Tracy Jones-Sanders

Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 19-21.[54]  The next day,

plaintiff sent the following email to Edwards (with the prior correspondence between

Recca and plaintiff attached):

Liz,

I hope that you are doing well and I am sorry to bother you, but the meetings with Dennis and Terry are amounting to Dennis trying to assert his authority, and therefore, he parades me in front of Terry on issues so that they can be in agreement and double up on me. Two on one is not fair to me and I choose not to participate under unfair circumstances.

Please see the e-mails, below, addressing my concerns of how he, excessively, questions me to the point that it affects my work output.  I have talked to others in the department about this and they say that this is how Dennis is, but that he does not question them on the level that he is questioning me and I want to know why? I have never had to explain everything that I do or experienced this level of questioning from any manager throughout my entire career.

We continue to not see eye-to-eye. He is frustrated in that he does not

---

[54] These emails were originally part of a chain.  They have been rearranged in chronological order.

understand Controls, i.e., what it consist of, the process and nature of Controls. I have explained my work in lay-terms (over & over again) but he comes back around to the same comments, "I can't get my head around it.." [*sic*] and there I go, explaining it again. I was told that he said, "she confuses the hell out of me" to one of my counterparts. Due to his lack of understanding about what I say and do, I can see the same thing happening again with my performance review. Typical to last year, a lack of understanding generates negative reviews about minor things, i.e., what the plant said or knit picky things (calendar, etc.) and do not penetrate the core of my responsibilities.

It amazes me to see him portray himself in a better light during our weekly calls but it's a different story, offline:

He routinely questions me about everything that I do, everything! It is to the point that when someone emails me and copies you, I can't respond to them for you e-mailing or calling me about it to explain. He questions me all the time about support issues, about Controls, about other things and now questions about my expenses. It is questions, questions, questions. I find myself explaining and explaining and explaining then explaining things over again. I understand that he has limited knowledge when it comes to Controls but I do not expect to be barraged with questions about everything that I do all the time to the point that it affects my work output and creates a stressful environment. The time that I spend emailing or explaining over the phone, I could have accomplished more of my work. He even questioned if I used the kitchen in the suite that [I] always use in Dallas, I find that quite excessive, then he came across like I was on a witness stand.

Although the installation phase of the Dallas project is complete, he does not understand that my work at the support level is just beginning. I must familiarize myself with the new system in order to be able to provide the same level of support (1st line defense) that I provide on our other systems. It is as if he does not want to allow me the time to become familiar with the system because he mentioned that it is his decision to have me focus on the GE side since we have more GE than AB but when I asked him, if I get a call about AB at 3:00 am, what

should I tell them, "I can't help you because I only work on GE," he could not respond to that. My role is to be able to provide a certain level of support on all automation systems/equipment/programs, he should understand that. He does not understand that I have to follow through with the contractors on the new system to ensure that we have all the program flies, software to open these flies, documentation, etc. We hardly have documentation because they do not follow through. Controls is not like his construction projects where after the construction phase is done, the project is finished and you move on to the next one. My work begins after the installation/construction phase.

I continue to be left out of Controls related meetings, calls, e-mails, interview process, etc. On one project, I was left out to the point that the outside contractor asked me why, the contractor then began to copy me on the e-mails, I thanked him and he responded, "It's the right thing to do." I hear things about the Controls portion of the project from the maintenance personnel here in Pell City and others but not from Dennis.

He continues to say that he can not get his head around what I do and does not read and respond to me [*sic*] monthly status reports. Although, I explain things over & over again, he has watched me do certain things by remotely viewing my computer, I sent him a week's calendar of what its like in Controls" [*sic*] but he still alludes to the fact that he can not get a handle on it and I confuse the hell out of him.

I am hearing from more than one individual about negative comments that he makes about me; Asking others about me; Asking (contractors, etc.) about Controls instead of relying on our internal staff. Contractors do not know our system as a whole, our philosophy or the direction that we are headed. On projects, everybody goes out and get them a contractor with consulting the internal controls group and we end up with things programmed so many different ways, no standards, no documentation, drawings, etc. but then they look to me to support it when something goes wrong at 3 am.

Inconsiderate — On one occasion, he changed our meeting to

32

2:30 pm, but just before that time, a out-of-town vendor had stopped by to talk to me, when I explained, he [said] you need to tell them to leave (the tone of it is what disturbed me)!! This put be in an uncomfortable position and I felt bad about just telling them to leave so I asked them to wait for me.  I stayed late to talk with them.

On another occasion, he was in Pell City and when it came to be 9:00 am for our meeting, his door was closed so I sent him an e-mail and asked that he be considerate of my schedule because I had planned my day around the 9:00 time slot. Also, if I ask him to change the meeting or to attend training or anything, the answer is always, NO!  I ask him questions in my monthly status report but he never responds.

Last month, when I reported off sick, he sent me an e-mail telling me to call a plant or contact Gideon or get a contractor, I did not read the e-mail until I returned to work because I was out sick. This is why he is there to manage and get backup for when I am out.  Most times if I do not feel well, I will work from home but this was not the case and he should have respected that.

He does things related to controls on his own without discussing them with me and produces the wrong results. He secured funding for a contractor to do some work and gave him a PO without talking to me, first.  Had he talked to me, first, he would have found out that the situation was resolved and there was no need to issue the PO.  On another occasion, he wanted our secretary to help me work on something, so he took it upon himself to send her a manual without any explanation along with it and told her to work on it.  If he had discussed this with me, he would have found out that the manual was irrelevant to the project at hand. I know that he meant well but by discussing things with everyone else and not me is not the way to get desired results.

On many occasions, I receive notes of thanks from the plants, but I never hear comments like, good job or thanks from management. I change my vacation time to accommodate the workload but I never hear a "thank you" for sticking around to take care of this. A good manager knows the importance of expressing goodness to his/her employees.

I am still just one individual trying to do the things that are already on my plate plus items that he keeps adding.

I do not know what it will take for him to understand me but I feel like I am spinning my wheels and being questioned very excessively. I see it as further harassment. It is difficult to follow the lead of someone who does not understand Controls, its workload and responsibilities and who, intentionally, leave me out on matters related to my area. It is as if he wants to call all the shots and micro-manage everything that I do without knowledge and understanding of what I do. Controls is the focal point of our paint making process but it continues to suffer under managers who do not understand or simply think that they know because they ask others. Therefore. I am looking to you as a resource for guidance.

Thank you,

Tracy Jones-Sanders

Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 17-19. The weekly meetings between Pallozzi, Recca, and plaintiff ended after this email.[55]

By November of 2009, Benjamin Moore had received a total of 109 applicants for the Senior Controls Engineer position.[56] Dotzman and Ken Marino, a Caucasian and Benjamin Moore's Vice President of Manufacturing, discussed what they wanted from the Senior Controls Engineer, and decided they needed somebody who was a

---

[55] Doc. no. 66-1 (Plaintiff Deposition), at 166. Plaintiff believes the meetings ended because she reported to Edwards that they were "two against one." *Id.*

[56] Doc. no. 66-20 (Recca Declaration), ¶ 29.

34

mentor, had supervisory experience, and controls experience.[57]   Leadership and supervisory experience was important because Dotzman and Marino discussed the possibility of adding more controls engineers.[58]

Pallozzi screened the initial applicants.[59]   Five candidates were selected for interview based upon review of the candidate applications, including Frederick Yama, a Caucasian.[60]   Pallozzi also forwarded plaintiff's resume for review for the Senior Controls Engineer position,[61] and Dotzman talked with plaintiff about the position and entertained her thoughts on how she could fulfill the role.[62]   Dotzman was familiar with plaintiff's skill set, and felt there was no need to interview her for the Senior Controls Engineer position.[63]

Pallozzi conducted the initial interview with Yama.[64]   Thereafter, Yama interviewed with Recca, Dotzman, Jonathan Shema, Gideon John, and Chris Reynaud.[65]   Dotzman and Recca then recommended Yama proceed to interview with

---

[57] Doc. no. 66-9 (Dotzman Deposition), at 10.

[58] *Id.*

[59] Doc. no. 66-12 (Pallozzi Deposition), at 37-38.

[60] Doc. no. 66-20 (Recca Declaration), ¶ 30.

[61] Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 5.

[62] Doc. no. 66-9 (Dotzman Deposition), at 16.

[63] *Id.*

[64] Doc. no. 66-12 (Pallozzi Deposition), at 39.

[65] Doc. no. 66-8 (Marino Deposition), at 8; doc. no. 66-9 (Dotzman Deposition), at 9, 19; doc. no. 66-7 (Recca Deposition), at 15-17; doc. no. 66-16 (Yama Deposition), at 11-14.

Ken Marino.[66]  Marino conducted the final interview with Yama.[67]  Marino didn't

interview plaintiff, however, because he did not believe she was qualified for the

position.[68]

Ultimately, Marino decided to hire Yama for the Senior Controls Engineer

position.[69]  Marino contends that he selected Yama over plaintiff because, in addition

to plaintiff's lack of leadership, Yama had experience in chemical engineering as well

as controls, while plaintiff's experience was limited to electrical controls, and Yama

had thirty-four years of management experience, while plaintiff only had twenty-four

years of management experience, and had not been a manager in nearly five years.[70]

Yama was offered the Senior Controls Engineer position on November 2, 2009.[71]

On November 12, 2009, plaintiff called Benjamin Moore's employee hotline

— The Berkshire Hathaway Workplace Alert Program powered by Global

Compliance — and reported that she was being discriminated and retaliated against,

---

[66] Doc. no. 66-8 (Marino Deposition), at 7-9.

[67] *Id.* at 8-9.

[68] *Id.* at 21.

[69] *Id.* at 7.

[70] Doc. no. 66-8 (Marino Deposition), at 25-26.  Plaintiff disputes these facts, but only cites to an email between her and Edwards regarding alleged harassment, and Recca's reasons for firing Yama.  *See* doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 11; doc. no. 66-7 (Recca Deposition), at 26-27, 40.  Plaintiff's complaints of harassment, alone, are not sufficient to dispute her lack of qualifications, and Recca's reasons for  terminating Yama are not sufficient to dispute his qualifications prior to being selected for the Senior Controls Engineer position.

[71] Doc. no. 66-20 (Recca Declaration), ¶ 31.

and subjected to a hostile working environment, because Recca was not including her in communications on a project and that she was denied a promotion.[72]  On November 23, 2009, plaintiff completed a follow-up call and requested that someone contact her as soon as possible because she was working in a "hostile work environment."[73]

On November 25, 2009, Recca announced that Yama would be the new Senior Controls Engineer.[74]  Rick Yama assumed the position on November 30, 2009.[75]  Thereafter, Yama was plaintiff's direct manager, and he reported to Recca, plaintiff's former direct manager.[76]  Yama was told there were communication issues with plaintiff before he joined Benjamin Moore.[77]

On December 1, 2009, plaintiff filed a Charge of Discrimination with the EEOC based upon her race and sex, alleging that she had been denied assistance to perform her duties and that she was denied a promotion to Senior Controls Engineer.[78]  The notice of the charge of discrimination was dated December 2, 2009, and was addressed to Edwards.[79]  On December 14, 2009, Global Compliance

---

[72] Doc. no. 66-1 (Plaintiff Deposition), at 162-64; doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 2.

[73] Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 3-4.

[74] Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 39.

[75] Doc. no. 66-20 (Recca Declaration), ¶ 32.

[76] Id.

[77] Doc. no. 66-16 (Yama Deposition), at 43.

[78] Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 23.

[79] Doc. no. 66-10 (Exhibits to Edwards Deposition), at ECF 38.

concluded its investigation of plaintiff's internal, hotline complaint, noting:

> We have investigated the complaint made by Tracy Sanders and have found the following:
>
> With respect to her claim that she was discriminated against by being denied a promotion to the position of Senior Controls Engineer because she is an African-American female, our investigation found this allegation to be unsubstantiated. Mr. Yama, the selected candidate, has 34 years of considerable experience in the field, as well as extensive management experience. Additionally, the job profile required electrical engineering or equivalent experience and Mr. Yama clearly has the requisite experience.
>
> Regarding her claim of a hostile work environment, Terry Pallozzi, the human Resources Business Partner, participated in weekly phone conversations with Tracy Sanders and Dennis Recca, Tracy's manager, and found no evidence of harassment. Also, based upon my interviews with Mr. Recca and Ms. Pallozzi, there were no findings of any evidence of mistreatment of Ms. Sanders by Mr. Recca.
>
> Subsequent to this complaint, Benjamin Moore & Co. Received a Notice of Charge of Discrimination filed by Ms. Sanders with the EEOC and Benjamin Moore will respond accordingly.

Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 4. On December 18, 2009, plaintiff wrote a letter to Warren Buffett, the Chairman, President, and CEO of Berkshire Hathaway, the parent company of Benjamin Moore, complaining generally of discrimination.[80]    Subsequently, Benjamin Moore investigated plaintiff's complaints from her EEOC Charge of Discrimination, but found no evidence of

---

[80] Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 6.

discrimination or harassment.[81]

On December 24, 2009, Recca emailed Pallozzi, Edwards, and Marc Zoldessy, Benjamin Moore's General Counsel, an early draft of plaintiff's 2009 Performance Review Form, noting that: "This review and the events that led up to it have not been a pleasant experience for me. My only consolation is that I feel confident that I provided every opportunity I could to Tracy for it not to have turned out this way."[82]

On January 4, 2010, plaintiff sent the following email to Pallozzi:

Terry,

I hope that you are well and that your enjoyed the holidays. I have approached HR about the fact that my vacation, bereavement leave, sick leave, etc., has been interrupted for over a year and a half due to my supporting role (365/24/7) and I see no urgency that would have prevented you from waiting until my return to send this e-mail. I respect your time off and I would request that the respect be mutual.

The intentions for hiring Rick was never communicated to me by management, I was left out of the process altogether. I have been requesting assistance with the workload for over a year and a half, not a new boss. It has always been my understanding that a senior level individual is a "lead," not a manager (manager is not in the title), however, if the structure of the engineering department has changed

---

[81] Doc. no. 66-10 (Edwards Deposition), at 24-25. Plaintiff disputes this fact because Global Compliance, a third party company, received a report from the hotline. However, Edwards clearly states that the report was sent to Benjamin Moore's Human Resources Department, who would then investigate. Additionally, Edwards only stated that Global Compliance received a complaint when the hotline is used. It is clear that Benjamin Moore's Human Resources Department received the complaint when plaintiff complained directly to the Human Resources Department — as she did numerous times.

[82] Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 50.

from department manger, lead, staff, etc., then I should have been informed (org chart, etc.) before Rick was ever bought on board. It is my right to understand both of our roles and responsibilities and to expect to see the skill set in a new hire that will allow him to be able to, immediately, shoulder the workload.

However, while consulting with EEOC officials, I was told that I have a right to protest discrimination, and therefore, I am protesting the fact that I have been assigned to six different individuals (with different personalities and expectations) in just over two years, subjected to mistreatment, unrealistic workload, the discriminatory manner in which Rick was hired and the fact that I am expected to divulge information that it has taken me two years to determine so that he can take it and manage over me. As well, it is inappropriate that within BM, the number of whites far out pace that of blacks, blacks have been working in the plant for over twenty years and have not moved up, there are very few blacks in management positions and none in the upper ranks. Minorities have been affected by work force reductions, mistreated, fired, demoted and, systematically, driven out. My position has been undermined and I have been ostracized from projects meetings, e-mails and the engineering group. Dennis and Joe had already created a hostile working environment and with me being completely left out of the process only add insult to injury which is not fair to me or Rick. I have tried not to attribute the mistreatment that I have received while at BM to discrimination but in retrospect, I attribute it all too entrenched racism, and with all due respect, I am calling for something to be done about it.

Happy New Year!

Tracy Jones-Sanders, EE

Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 13 (emphasis in original).

On January 7, 2010, Edwards sent the following email to plaintiff:

40

Hi Tracy,

Per our conversation today, this is to confirm that Dennis Recca has forwarded to me the concerns that you've highlighted in your year-end '09 Self Assessment. Regarding the Senior Controls Engineering position, given that you have already filed a complaint with the EEOC regarding this matter, we believe that it is best served to have this issue addressed through the formal EEOC process. As indicated, our attorney has already been in contact with the Commission.

Regarding your concerns about workplace harassment by your manager, based on our involvement during meetings and investigations of your prior complaints, again, we have not found any evidence that supports a claim of harassment or hostile workplace.  However, given the relationship between you and your manager and the allegations that you have made, Dennis has requested that I sit-in on the year-end performance discussion with you that is scheduled for Friday, January 8th.  Based on your feedback, this is also welcomed. Therefore, I will be on the call tomorrow.

Sincerely, Liz

*Id.* at ECF 14.

Thereafter, Plaintiff received her 2009 Performance Evaluation.[83]  Plaintiff was given a rating of "3-Meets All Expectations," just as in her 2007 and 2008 evaluation.[84]  However, in addition to noting several of plaintiff's successes, Recca noted several weaknesses, including, for example, the following comments:

Tracy has shown an ability to work well with some individuals and on different type projects but not with any consistency.  Instead of

---

[83] Doc. no. 66-1 (Plaintiff Deposition), at 172-73.

[84] Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 24-33.

responding to a call for help from a plant with the positives she can provide she will sometimes focus her discussion on all the limitations she perceives to have that prevent her from helping properly or at all. An example was when internet access reimbursement was first curtailed, but then reinstated, Tracy still advised the plant that her ability to support them was questionable because of this.  Some plants have complained on numerous occasions that Tracy is just not returning their calls.  This lack of cooperation, sense of not being a team player has created a level of frustration from the plants to the extent that many seek assistance elsewhere.

Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 58-59.  Plaintiff made the

following additional comments in her 2009 evaluation:

I assisted management in writing the technical sections of the job posting (software used, functions, technical ability sought, etc.) for the Senior Controls Engineer position.  However, with all the above being said, I applied for the position and was not given the opportunity to, at least, interview (by phone or in person)!!!  Blatant disrespect and discriminatory!!!!!

For over two years, I have successfully performed every aspect of the Senior Engineer position, working independently, supporting (5) plants, completing 4 startups in 8 months without any support, yet I have been overlooked for the position.  I continue to be left out of e-mails, meetings, etc. that are relative to Controls, to the point that a contractor asked me why I was being left out, so he began to include me on e-mails, I thanked him for doing this and he replied, "It's the right thing to do."  In the two years that I have been here, I have been placed under (5) managers.  However, since the departure of Art Mengon, I have been placed under managers who do not understand the work that I do so they give me negative reviews about trivial things with untruths.

My current lead, gives me negative attitude (gets smart with me, harassment, etc.), do (sic) not respect my technical abilities, targets my work from home days (sic) with lengthy phone calls of excessively

42

questions/explanations, harassment, adds to an overbarring work load, ignores my ideas/ recommendations and have overlooked me for the senior position.  I have sacrificed my time off to assist the plants but I never hear "thank you" from management.  He does not know enough about my job to recognize successes in my area.  This is not beneficial to my performance, the engineering department or Benjamin Moore.  I continue to work in a hostile working environment due to retaliation and discrimination.

. . .

When I, recently, spoke with the VP of Manufacturing about being left out on Controls related issues, his only response was that BM is so fast pace, he did not say that it was unacceptable or offer to correct the situation.  When we discussed how I was being treated and the fact that I have been placed under several managers who do not know what I do and explained that their lack of such knowledge is detrimental to the company and staffers' progress of Controls, he placed my job in jeopardy by telling me, first there was a problem with Jessie, now Dennis, if you do not get along with the new Senior Controls Engineer, there will be no other options.

Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 53-59.

On January 13, 2010, plaintiff filed a second Charge of Discrimination.[85]  In addition to her previous allegations, plaintiff alleged:  "Since filing this charge of discrimination I was given negative commentary by my supervisor on my annual evaluation even though the overall rating was a meet expectation.  This type of evaluation is used by the employer to terminate employees when there is a reduction

---

[85] *Id.* at ECF 40.  Plaintiff also checked the box for "retaliation" in her second Charge of Discrimination.

in force or downturn."[86]

In March of 2010, the following email correspondence occurred between Yama

and plaintiff, with Edwards eventually copied onto the email chain:

**From:** Yama, Rick
**Sent:** Monday, March 08, 2010 3:48 PM
**To:** sanders, Tracy
**Subject:** 5K Reactor

Tracy . . .

I see you have a meeting scheduled for the 5K reactor. The one thing I
need soon is the data plate info on the mass flow meters. These are the
primary and most expensive instruments that can probably be reused.

How is the Cell Touch button updates coming?

Rick

. . .

**From:** Sanders, Tracy
**Sent:** Monday, March 08, 2010 3:53 PM
**To:** Varna, Rick
**Subject:** RE: SK Reactor

Fine.

Tracy Jones-Sanders, EE

. . .

**From:** Yama, Rick

---

[86] *Id.*

**Sent:** Tuesday, March 09, 2010 9:26 AM
**To:** Sanders, Tracy
**Subject:** RE: SK Reactor

Tracy . . .

What does fine mean? Can you give me your target completion dates for the first cell? As you are only adding text to buttons, I don't think it should take that long. Second, please walk out and record and send the info for the 3-4 mass flow meters in the 5K reactor.

Rick

. . .

**From:** Sanders, Tracy
**Sent:** Tuesday, March 09, 2010 10:33 AM
**To:** Yama, Rick
**Cc:** Edwards, Liz
**Subject:** RE: SK Reactor
**Importance:** High

Rick,

Please do not take this tone with me. I am working on more that just the Pell City HMI changes and I ran into some things that had to be clarified and addressed on cell 1, otherwise, things are going fine. I plan to finish cell 1 by the end of the week, you have the intranet link to monitor progress. Also, I asked you for assistance with some of the other plant requests that I have put on hold in order to work on Pell City, but you did not respond.

I was out in Resin on yesterday [*sic*] getting information to prepare for the meeting, today. According to Dan and Edward, mass flow meters and the SCADA system (equipment and instrumentation) will not be used in the Spiral Heat Exchanger project, so do you need this information for another project? I thought we were working on the

45

Spiral Heat Exchanger; I have meetings, today and tomorrow on this project, that I am preparing for.

However, this is not the first time that you have taken this tone with me and I will not tolerate this treatment, therefore, I am requesting that you please refrain from addressing me in this manner.

Regards,

Tracy Jones-Sanders, EE

. . .

**From:** Yama, Rick
**Sent:** Tuesday, March 09, 2010 5:22 PM
**To:** Sanders, Tracy
**Cc:** Edwards, Liz
**Subject:** RE: SK Reactor

Tracy . . .

I would like to provide some clarity regarding my e-mail below to you. As your manager, I have a responsibility to know the specific details on your project and prioritize them accordingly. Your response to my question was vague. In order for me to appropriately manage the work load, it's a reasonable expectation for me to ask you to provide the specific project details, completion dates, roadblocks and accomplishments. There was no intended malice or tones in my e-mail to you so please do not interpret it as such. Again, the e-mail merely requested more details to my original question: "How is the cell Touch buttons update coming?"

In regard to the 5K reactor, it was Dan's and my intent to use the project as a basis to set up the process for further automation. If we have instrumentation we can use or reuse I need to know about it so it might be incorporated in the initial project.

Going forward, I will be asking for regularly updates regarding the progress of your work.

Rick

. . .

**From:** Edwards, Liz
**Sent:** Tue 3/9/2010 10:41 PM
**To:** Sanders, Tracy
**Subject:** FW: SK Reactor

Hi Tracy,

I reviewed the below string of e-mails. Rick's request for a status update is reasonable as your manager. It's important to maintain communications with him about any of the projects that you're working on.

Regards, Liz

. . .

**From:** Sanders, Tracy
**Sent:** Wednesday, March 10, 2010 8:40 AM
**To:** Edwards, Liz
**Subject:** RE: SK Reactor

Liz,

Please be advised that it was not my intention for you to validate the e-mail that I copied you on, it matters only how I felt and I want it documented. The following statement could have been said a different way "As you are only adding text to buttons, I don't think it should take that long." This statement set a negative tone and this is not just my opinion, but others as well. He asked me how it was going, I said fine, if he had more specific questions, then he should ask them.

I understand that you work to protect management and I do not expect you to come to my defense, I only want it documented that I found it offensive, if not, disrespectful. It is his approach that is the issue, not the fact of him asking questions about my work. It is a way to handle everything and his approach is not the way to cultivate team work, given the hostile work environment and the fact that he is new.

Thank you,

Tracy Jones-Sanders, EE

Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 9-11.[87]

On April 29, 2010, plaintiff sent the following email to Pallozzi and Edwards:

Terry,

Per our conversation regarding Rick's comments, as I explained, I had previously e-mailed Liz about it, therefore, I will refer you to her. However, on Friday (4/9), there were additional derogatory remarks about the work, as the e-mail in question, stated.  Rick has also made other unappealing statements to me, one example, during his last visit to Pell City (2/09), he said that he had been in this situation before where he got the job (Sr. Control Engineer) and I didn't.  It took all that I had to keep my mouth shut!  I couldn't believe he said that!!  I didn't say anything but I didn't appreciate it, at all, and several of my counterparts and family members could not believe that he said it to my face like that. He also said that he has an advantage over me in that he is located in Flanders.

I do not know what Dennis has told him about me and past issues but his attitude reflects a negative tone that does not cultivate a "team work" working environment. Given the fact that he is new and does not have any prior experience with our hardware/software, has not completed a

---

[87] These emails were originally part of a chain.  They have been rearranged in chronological order.

tasked/project the entire five months on the job and does not exhibit the instinct and leadership that it takes to do the job, people are taking notice. I continue to ask for assistance on plant request issues and raise controls questions/issues in my monthly project summary but receive no response.  BM deserves a better controls group than this!

I still say that since Rick is not pleased with my work on the Pell City Manifolds, he should finish it, maybe then we can get some work out of him.  Every time he is asked to do work, he calls Chris Raynald, the contractor who also did not get the job, asking how to do things.  Chris contacted Dennis about it, asking that Rick not call him, he wants to stay out of it.  Now, Rick calls Edward Haller.  There was a blow up, the other week, between Rick and someone in IT because Rick called Edward and could not do the work, himself. I hear that the term "discrimination" was used referring to how they (Dennis & Rick) call Edward, as if he is the Controls Engineer, instead of calling me.

Also, is the fact that we do not, equally, share the on-call workload going to be re-addressed (I understand that he is being paid extra for this, yet I still receive nothing)?  Liz said that it is up to the manager to assign the hours so Dennis sent something saying that Rick would be "backup" which continues to leave me doing all of the PLC/HMI on-call work (7/24/7) because the plants have my phone number, not his.  Why is he being paid more and is not doing the work, will I receive extra pay since Rick does?  Let's be fair about the work load and salary.

Regards,

Tracy Jones-Sanders, EE

Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 21.  On May 3, 2010, Sanders again reported to Edwards that she was being left out of projects for which she would be providing system support.[88]

---

[88] *See* doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 22.

At some point during plaintiff's employment, Benjamin Moore revised plaintiff's job description to include on-call activity.[89]  Thereafter, in April of 2010, plaintiff requested and was granted FMLA leave.[90]  She began her leave on May 11, 2010.[91]  On May 19, 2010, Benjamin Moore received notice that plaintiff filed an OSHA complaint against the company.[92]  On June 7, 2010, Benjamin Moore learned that plaintiff had filed a second OSHA complaint alleging that the company retaliated against her by terminating her pay while she was on sick leave.[93]  On August 2, 2010, Pam Sori, plaintiff's medical provider, wrote a letter stating that plaintiff could return to work on August 3, 2010, with the following limitations:

> 1) that she be permitted to work on her usual duties independently; and 2) that she **not** have sole responsibility of plant support seven days a week, twenty-four hours a day, in that such duties are divided equally (three and one-half days) between Tracy Sanders and other designated staff.

Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 31 (emphasis in original).

The next day, plaintiff faxed Sori's letter to Benjamin Moore and returned to work.[94]  Thereafter, Recca sent the following email to Pallozzi, Edwards, Yama, and

---

[89] Doc. no. 66-10 (Edwards Deposition), at 87-88.

[90] Doc. no. 66-1 (Plaintiff Deposition), at 66, 179-80.

[91] Doc. no. 66-1 (Plaintiff Deposition), at 66.

[92] Doc. no. 66-21 (Edwards Declaration), ¶ 11.

[93] *Id.* ¶ 13.

[94] Doc. no. 66-1 (Plaintiff Deposition), at 66; doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 29.

50

Zoldessy:

> Terry
>
> We received this fax from Tracy today.  Apparently she is back to work.
>
> Please advise us on an appropriate response, if any to the fax.  In light of the requested limitations I would also like to have some guidance for Rick and I on the best way to conduct communications and introduce work to Tracy.
>
> J. Dennis Recca, P.E.

Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 31.  Pallozzi forwarded Recca's email to Diane Delikat, a Benjamin Moore Nurse and Short-term Disability specialist.[95]

On August 4, 2010, Delikat faxed a letter to Sori stating: "Enclosed is a job description for Tracy Jones-Sanders, can she perform this job as described?"[96]  Sori faxed a written response, stating: "Yes."[97]  On August 5, 2010, Delikat sent the following letter to Sori:

> Dear Ms. Sori,
>
> This letter will confirm that we have received your release of Ms. Tracy Jones-Sanders return to work effective August 3, 2010.  You subsequently confirmed via voicemail that Ms. Sanders is able to fulfill all the essential duties of her current role as Controls Engineer based

---

[95] Doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 29.

[96] Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 32.

[97] *Id.*

upon the role profile that I provided for your review.  You should be advised that Ms. Jones-Sanders will continue to report to her current manager.  She will be expected to take direction and work on projects as assigned to her.

In regards to Ms. Jones-Sanders responsibilities of providing 24/7 plant support, we have made arrangements that Ms. Jones-Sanders will only be required to support plants during the course of her normal work day.

If you have any questions regarding this letter please contact us by the close of business today as Ms. Jones-Sanders manager will be reviewing with her the current responsibilities of her position in accordance with the release you have provided us.  In the absence of hearing from you, we will move forward with assigning Ms. Jones-Sanders current projects that require her attention.

Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 22.  Plaintiff's work schedule was then modified to 7:30 a.m. to 3:30 p.m., with no on-call responsibilities.[98]  Following plaintiff's return to work, Benjamin Moore terminated her FWA.[99]  According to Edwards, plaintiff's FWA was terminated because Recca was not happy with the way she had been keeping her calendar.[100]  Yama sent the following email to plaintiff regarding those decisions:

Tracy . . .

Again — welcome back.

The following is a recap of our conversation:

---

[98] Doc. no. 66-10 (Edwards Deposition), at 109-10.

[99] Doc. no. 66-1 (Plaintiff Deposition), at 184-85.

[100] *Id.* at 192-93.

- Your working hours will be 7:30AM to 3:30PM Monday through Friday.

- All Scheduled work will be on site at the Pell City facility. (HR — please note that Tracy said she had an agreement with HR about working from home). Per consultation with Dennis Recca I have rescinded the WFH on Wednesday.

- You will follow the callout/vacation protocols set forth by Dennis Recca earlier this year.

- You will handle any and all 2700 Automation emergency issues from Tuesday (0:00AM) thru Friday evening (until 12:00PM) unless you are on schedule time off. I will handle Saturday through Monday. If I am on vacation during a weekend I will expect you to fill in for me. Of course I am always willing to help out if the need arises.

- We will work out your project schedule in the next week. You will provide an update every other Friday by workday end.

- We will set aside time two days a week to talk directly about your projects.

- Your initial assignment is to document the entire Tank level system starting with schematics. I will give you scope and further detail on Monday the 9th.

Let's work together to further your success at Benjamin-Moore this day forward.

Regards,

Rick

Doc. no. 72-1 (Exhibit 1 to Plaintiff's Response), at ECF 2.[101]  Plaintiff then sent the

following email to Edwards on August 5, 2010:

> Liz,
>
> I hope that you are well.  However, Rick Yama told me that he spoke with you all about discontinuing my work from home benefits (here we go again).  However, since I am not being paid extra for after hour support like Rick nor Will I have the benefit of adjusting my schedule to accommodate this responsibility, how am I to provide 3:00 am coverage? I would like to know how we can be fair about the around the clock coverage where I receive no pay and I am expected to answer a calls, for instance, at 3:00 am and report to work at 7:00 am?  I see this as a means to continue to retaliate against me by taking away a benefit that was afforded to me upon coming to work for BM.  I was given approval by you to work from home and I am still operating under that agreement. I still have the same responsibilities that I had when we went through this before, why do they continue to try to take things away from me? Why am I being targeted? <u>No one else is going through all of this</u>, is it because of my FMLA leave or complaint filings with HR, OSHA and the EEOC?  **Therefore, I am requesting that you please look into this as retaliation, per the employee handbook, BM states that retaliation will not be tolerated.  Also, it is against federal law to retaliate (deny benefits, deny promotion, intimidate, etc.) against any individual who has exercised their civil rights. I am also requesting to be moved from under current management and that something is done about the retaliation**.
>
> Please see the attached agreement that you sent to me and that I continue to work under and the work from home form that I submitted when they tried to take this benefit from me before, my work requirements still

---

[101] Yama's statement that plaintiff would be handling some on-call responsibilities conflicts with Edwards's deposition testimony that plaintiff's work schedule was modified to include no on-call responsibilities.  Future emails suggest that plaintiff had no on-call responsibilities following her FMLA leave, but that Benjamin Moore expected her to assume those responsibilities eventually. *See* doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 24-26.

remain the same. However, if you can not resolve this issue. I would like to, personally, meet with Ken or Dennis Abrams relative to this matter.

Also, upon my return to work, on Tuesday, I noticed that a GE PLC and Woodhead Gateway device is missing from my office, also my project manuals were ruffled through, I have asked several individuals about the missing equipment and was told by Edward and Gideon that Rick was in my office two weeks ago and that he may have taken it. I am a peaceful/God fearing person who do not wish to cause confrontation but I feel that, it is disrespectful that he took it without so much as sending me an e-mail or leaving a note about it, this is equivalent to theft. Please have Rick to return it and ensure that a lock is installed on my door. I am hopeful that your response will not be the usual: he is your manager and he has the right to take things . . . , because he does not!! I would not go to Flanders and just take things from his office or go through his things. I, subsequently, saw an email from Rick to Edward indicating that he has the equipment and that had sent it back but Edward has not seen it and it is still missing from my office.

It is unfortunate that I have to continue to report mistreatment/retaliation/discrimination and it is even more unfortunate that management allows it to persist and then expect me to work with these mean-spirited individuals as if continuous mistreatment is not happening. However, I find it ironic that the employee handbook says that BM does not tolerate such things yet the same people remain in their same positions without any reprisal, however, it appears that BM would rather see me as a trouble maker and strive to make things hard for me or even get rid of me instead of ensuring that its management live up to its words in the employee handbook (equal opportunity for all, no tolerance of retaliation, invest in employee development, safety first, etc.). Again, I have done nothing to warrant this kind of treatment, nothing!

The last time management made this decision, it forced me to have to tell the plants that I am not allowed to work from home any more and management became upset and the incident was, adversely, put in my 2009 performance review. We have so many other things to be

concerned about rather than me working from home. We should be concentrating on safety (all plants), especially, since the recent *explosion*, a little over a week and a half ago.

"*All a man's ways seem right to him, but the Lord weighs the heart*" *(Proverbs 21:8 NIV)*

Kind regards,
Tracy Jones-Sanders, EE

Doc. no. 66-14 (Exhibits to Pallozzi Deposition), at ECF 2-3 (emphasis in original).

On August 10, 2010, Edwards sent plaintiff the following email:

Hi Tracy,

As promised, I've looked into your concerns that you've called out in your e-mail to me dated August 5, 2010. I also reviewed a copy of your e-mail to your manager, Rick Yama.

As always, we take your complaints very seriously and thoroughly investigate each one. Based on the findings from our investigations and your letter to us, it has become quite evident that you either do not understand or agree with the company's standard policies or practices. As a result, it appears that you continually interpret standard operating procedures that apply to all employees and to you as well, as harassment or retaliation. We understand you may not agree with all the standard policies and practices, but you do need to abide by them. After each investigation, your claims continue to be unfounded. Based on our findings from this investigation, we have seen no evidence of retaliation, harassment or discrimination.

For example, it's standard practice after an employee returns to work from a Leave of Absence for the direct manager to re-orient the employee by reviewing the expectations, work procedures, assignments, etc. — many of which may change in light of the current business factors at hand. Last week, this is exactly what Rick Yama did with you.

Below summarizes our findings based on the points in your e-mail:

- Although your core working hours have been deemed as 7:30 AM to 3:30 PM, Monday through Friday. Your job is classified as "Exempt" which means additional work hours performed by you are not eligible for overtime. This has been consistent since the beginning of your employment and explained to you on several occasions. We ask that you do not bring this up again unless you have new information supporting otherwise.

- As a point of clarification, your "On Call" hours are now shared about equally between you and your manager. You are "On Call" from Tuesday 12:00AM (Midnight) thru Friday 11:59 AM which is 64 hours not including your core hours at work. Rick is "On Call" from Saturday 12:00 AM (Midnight) thru Monday 11:59 AM, which is about the same number of non-core hours. Over the last 3 months, the "On-Call" emergencies have averaged about once per month. This is consistent with the activity level that you experienced too. If you should receive an emergency call which requires an excess number of work hours during your non-core schedule (e.g., 3 AM in the morning), you need to contact Rick directly, discuss the emergency, what was performed, and request the need to report to work at a different time on the following day.

- Per our Flexible Work Arrangement policy, granting an alternative work arrangement is based on several factors including the demonstrated behaviors by the employee (e.g., knowing and following company policies and practices as well as the ability to effectively communicate with one's manager.) It's been quite clear that you have not followed the direction around reporting out to your manager on projects/workload, nor the basic report-out procedures established by Dennis Recca. Therefore, it is justified that you report to the company's facility on a daily basis, and you are expected to do so going forward.

- Furthermore, you mentioned in your e-mail to Rick that since you are not allowed to work from home on Wednesday, you will not

57

be able to handle "On Call" emergencies although you have all the necessary equipment to do so and being reimbursed for high speed access. Being "On Call" is a requirement of this job. Therefore, you are expected to do so since you have the ability and necessary tools to perform your responsibilities from a remote location. Should you continue to refuse to perform your "On Call" responsibilities, the company will have not [*sic*] alternative but to deem this as insubordination.

-    Regarding the removal of items in the office located in the Pell City Plant, you should be aware, they are all company property (e.g., Rack of GE, Woodhead, etc.) which was needed at another location. If you need to utilize them, please request the use of them from your manager. A lock will not be placed on the office door. You have the ability to put any personal items in a secured draw [*sic*] or cabinet.

I hope that I've addressed the issues at hand. If not, we can discuss if you wish. I want to ensure that you fully understand your responsibilities and authority. Your refusal to adhere to these expectations could lead to corrective action up to and including termination.

Also, prior to your Leave of Absence back in the April/May 2010 timeframe, you sent Terry and me a couple of e-mails that warranted our review. Attached are our findings, Terry summarized them but did not send this to you because she didn't want to interfere with your FMLA leave. After you have read our-responses, again please feel free to contact Terry or me if you would like to discuss.

Lastly, please remove the closing footer to your e-mail immediately. Religious proverbs can be interpreted as inappropriate in the workplace and I have personally received complaints from other employees.

Thank you, Liz

Doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 30-31.

On August 11, 2010, Pallozzi sent the following email to plaintiff:

To: Tracy Jones-Sanders
From: Terry Pallozzi,
Re: E-mail Follow-up

In the April/May 2010 timeframe, you sent me a couple of e-mails. I'm sending the responses to you now because we didn't want to interfere with your FMLA leave and waited for your return. It's important to us that we fully address your concerns, so after reading the below, please feel free to contact me to if you would like to discuss.

On May 6, you wrote an e-mail to us in response to the findings re: Pell City Manifold Incident. We investigated the matters outlined and summarized them below.

**Regarding the role of HR:**
As indicated to you in the past, it is the role of HR to be objective and obtain the facts from both management and the employee. We have always strived to do this when you have contacted us by promptly investigating your concerns and gathering the facts in order to arrive at an independent conclusion and make recommendations accordingly. As you are well aware, I attended your weekly meetings with Dennis Recca, based upon your request to Liz, because you did not want to have on-going 1:1 conversations with Dennis, who was your direct level manager at that time. This request is quite a difficult demand to accommodate yet, we were able to do so for over 2 months, at which time you then requested that I no longer be present.  It should be noted that Benjamin Moore & Co has made a significant investment of time, patience and understanding to help you address the matters that you brought to our attention.

**Allegations of Discrimination:**
In Rick's memo to you dated May 5, 2010, Rick pointed out a lack of control procedures associated with your change management process to add text to the buttons at Pell City. He also highlighted the need for you to better demonstrate the ability to take feedback and objectively

manage conflict. Rick's memo summarized his findings as to what transpired and his performance expectations of you. Given the lack of open communications between both of you, Rick summarized his findings in writing to you. His letter is neither threatening nor discriminatory.

**Regarding Cimplicity System Coordination**

- It was verified that Chris Raynaud was engaged to work on the CCC Project involving the addition of new tanks, raw materials and a pigging system during the same time you were working on adding text to the buttons at Pell City.
- Chris also confirmed that you did in fact let him know when you were done working on the system so he could then access it. This was confirmed in the email you provided which reads as follows. "Tracy, please let me know when you are done for the day so I can spend some time and have cell 1 back for a few hours in the evening, I work late these days. Cell 1 will be back to you at midnight, every time we do so. Best regards, Chris".
- Upon further investigation Chris acknowledged your e-mail quote that you provided to me: "Tracy, My next phase is to work on the following ingredient/manifolds RM2020, J7 PLIOTEC, F1 PROP GLYCOL, D TEXANOL, D TAMOL 731, A. If you could start with these, it would help. Chris". Chris confirmed that as he added new buttons to his part of the project, he would then notify you that his buttons were available for you to access and add the appropriate text as per your assignment. Your tasks were significantly different from those of Chris. Chris was engaged and assigned a project for new additions to the system for CCC. You were assigned the task of adding text to both existing buttons on the manifold and the additions that Chris made for the CCC Project. However, as originally indicated to you, mistakes were found in the system with the text additions you had been assigned and responsible for.

**Regarding the disruption of your work**

As far as you having to abruptly turn over the system to Chris during the

week of March 22, which you indicate caused interruption to your work, we have an e-mail that was sent by you to Phillip Boyd with a copy to Dennis Swanson, Dennis Recca, Rick Yama, Paul Tomaszewski, Jim Baker and Bernard Hilton stating on Thursday March 18th that, "Cell's 2 and 3 are now complete . . ." Based upon your e-mail you indicated that your assignment was complete. Your claims that your work was interrupted and there was a lack of coordination appear to be unfounded.

**Regarding Workplace Safety and Operations**

- Please be advised that Benjamin Moore & Co takes workplace health and safety seriously. The health and safety of our employees is paramount. At no time were you forced to work under unsafe conditions nor were your [*sic*] pressured to make changes or updates with out ample time to do so. As a Benjamin Moore employee you will be required to meet deadlines but never at the expense of accurately and safely completing your work.

- Rick pointed out to you that there were not appropriate controls put in place to verify and audit the results of your work. Whenever embarking on a project, a controls process should be outlined and updates to the system must be verified prior into live production. In your e-mail to me you stated, ". . . to insist that I work in the system while someone else is in the same system to rush me through this and not validate the changes made . . .". At no time, did anyone instruct you to not validate your work; moreover, this statement contradicts your earlier e-mail to Dennis Swanson and team that stated the work was completed.

Tracy, you have been directed and encouraged over the last year to foster communications with your supervisors and inform them of issues or delays in your work. At no time did you proactively reach out to management to express the concerns you are now calling out. Rick and the rest of the management team have, and will continue to, ask for status updates and delivery of projects according to deadlines which is well within their scope and responsibilities. However, you also have an obligation to notify them when there are roadblocks or difficulties in achieving the task so they can help you.

**In your e-mail to us dated April 29, 2010, you had concerns about the workload and your managers' qualifications which we also want to address:**

**Regarding Engineering Workload:**

-   Once again, you continue to question the issue of the on-call workload and remuneration. The on-call schedule is set by your management team.  Whether you agree with it or not, it is incumbent upon you to follow Rick's direction. Again we've looked into this matter and have determined that there have been no unreasonable demands placed upon you for on-call work responses. As a Controls Engineer, handling on-call requests is part of your job responsibilities.  In fact, this issue was addressed by both Liz Edwards and me in an email to you dated August 3, 2009. Also contrary to your statement.

**Statement regarding Managers Qualifications and Treatment:**

-   Tracy you continue to question your managers' qualifications and demean their expertise. For instance, Rick Yama has over 30 years of experience and you consistently write to me about your perception of him. While we understand that you were upset over the decision to hire Rick instead of you, the decision has been made and we ask that you not slander Rick's skills, qualifications or experiences. While you continue to allege that Rick belittles your work and is condescending to you, there have been occasions where your communications to Rick, your current manager, and to Dennis Recca, your prior direct manager were inappropriate and insubordinate.

Throughout all of our investigations, we have been quite objective to share our findings and conclusions with you including the need for you to focus on your communications style — we have consistently found it to be ineffective in building strong working relationships and we have numerous examples of this. Again, we ask that you too strive to foster open communications and dialogue with your management team. This

is one of the foundational areas that is needed in order to be successful at Benjamin Moore & Co.

There is quite a bit of information contained in this letter. Please let me know if you would like to discuss.

Doc. no. 66-14 (Exhibits to Pallozzi Deposition), at ECF 4-6.

Following the termination of plaintiff's FWA, she requested, and was permitted, to leave work early on Wednesday afternoons to attend a doctor's appointment.[102] On Wednesday, August 11, 2010, Benjamin Moore requested a note from Sori to substantiate plaintiff's doctor's visit for that day.[103]  Plaintiff responded the next day:

Per your request is an excuse for my doctor's visit on, yesterday. However, it is my understanding (as I have asked many individuals, here) about the doctor's excuse policy and I am told that you need an excuse when you are out sick for three days or more.  Although, the employee handbook states that BM has the right to request an excuse with any absence, I have never abused the system and there is no other reason for your request other than retaliation.  You and Dennis are targeting me and treating me differently from other employees in the company.

Also, I will continue my appointments, weekly which will be reflected on my calendar.

Thank you,
Tracy Jones-Sanders

---

[102] Doc. no. 66-10 (Edwards Deposition), at 120.

[103] Doc. no. 66-2 (Plaintiff Deposition), at 202-03.

Doc. no. 66-14 (Exhibits to Pallozzi Deposition), at ECF 7.  Plaintiff attached a note

to her email, signed by Sori, indicating that plaintiff was at a doctor's appointment

on August 11, 2010, and that Sori's office would not fax an excuse or any patient

information.[104]  Edwards responded:

> Hi Tracy,
>
> You are correct that Doctor's notes are generally requested when a [*sic*] employee is out sick for 3 or more days.  However, as you also [*sic*] aware, BM has the right to request a note for any number of days sick. Given that you were just asked to report to work on Wednesdays (rather than working remotely), a doctor's note to confirm you [*sic*] visit on that day is being requested.  It does not need to be faxed: you should just request a note at the time of your visit and bring it back to work with you.
>
> Also, you mentioned that you have weekly doctor's appointments. You'll need to make every effort to make those appointments during your non-Core working hours.  Again, you are requested to report to work every Wednesday during your regularly scheduled hours.
>
> Thanks, Liz

*Id.*

On August 18, 2010, Edwards sent plaintiff the following email:

**From:** Edwards, Liz
**Sent:** Wednesday, August 18, 2010 4:39 PM
**To:** Sanders, Tracy
**Cc:** Pallozzi, Terry
**Subject:** RE: Report of Retaliation - Working from Home Ability

---

[104] *See* doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 35.

Terminated Jeopardizing After Hour Support/Automation Equipment Missing from my Office

Hi Tracy,

I would like to clarify some of the items in both of your e-mail notes to me - one below and a subsequent e-mail dated August 13, 2010 at 12:49 pm.

With regard to your claim that you are entitled to overtime, once again, we examined the role of Controls Engineer and confirm to you that this role is Exempt as defined by the Fair Labor Standards Act. Therefore, any incumbent in this role is not entitled to overtime.

Secondly, On-Call is part of the responsibilities of your role; although it is not specifically highlighted in the Job Description, it's a responsibility that was communicated to you in the past and we foresee On-Call coverage continuing to be a part of this job responsibility in the future.

You are correct that arrangements have been made so that you will only be required to support the plants during your normal work day, which is now 7:30AM-3:30PM. We have granted a reasonable accommodation in light of your doctor's request dated August 3, 2010; however, this accommodation is temporary in nature given the requirements of the job. We will need to further explore the anticipated length needed for this accommodation with your medical provider. Please be aware that once the accommodation is lifted, we foresee splitting the On-Call hours between Rick and you as outlined in my note to you below.

In your second e-mail to me, you've requested another accommodation which is to be excused from work every Wednesday afternoon around 12:30-1:00 PM to attend your doctor appointments. Given the nature of your role, as well as your rebuttal to report to work at the Pell City site on Wednesdays, prior to granting this accommodation to you, we would like Diane Delikat, the company's nurse, to speak directly with your two medical providers as part of our due diligence process. This will help us

65

to better ascertain the accommodation that we will need to make for you.

In order for Diane Delikat to speak with your medical providers, you will need to grant her permission by e-mailing her with the following information:

-    Name of the two Medical Providers
-    Address
-    Telephone #'s

Until you provide Diane with your permission and the providers' information, we are not in a position to contact your providers to discuss the specific needs of your requests to make a reasonable accommodation. Tracy, we truly need your cooperation in order to allow us to properly consider your request for any accommodation by the company.

Regarding some of the other subjects that you've noted in your e-mail, it would be highly inappropriate for me to share any information with you pertaining to Gerald or any other employee. Regarding communications with OSHA, any pending OSHA complaints will be responded to accordingly by the company.

Regards, Liz

Doc. no. 66-5 (Exhibits to Plaintiff Deposition), at ECF 34-35. The next day, plaintiff sent an email to Edwards, Pallozzi, and others stating that she was taking prescribed medication for insomnia that impaired her ability to function outside of her normal hours of work.[105]  Attached to plaintiff's email was the following letter from Sori:

Dear Ms. Edwards:

I am writing this letter as a follow-up to my return-to-work letter dated

---

[105] Doc. no. 66-1 (Plaintiff Deposition), at 183-84

August 2, 2010 so that Ms. Jones-Sanders will improve and not decompensate.  I would like to refer to the letter received from Corporate Nurse, Diane Delikat, dated August 5, 2010, in which she stated that "Ms. Jones-Sanders will only be required to support plants during the course of her normal work day," which I understand is 7:00 am to 3:30 pm.  My recommendations are that she continue with this work routine, and that she have no overtime work added to her schedule.

Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 36.

Delikat purportedly faxed Sori a standard Reasonable Accommodation questionnaire to complete on behalf of plaintiff on August 24, 2010, and again on September 1, 2010.[106]  Sori never responded, even though Delikat left messages on Sori's phone.[107]

On August 31, 2010, plaintiff sent the following email to Pallozzi, Edwards, Yama, and Zafor Ullah, an investigator with OSHA:

Terry,

Under the circumstances of a hostile work environment and continued threats, I have a right to protect myself from the kind of behavior that Rick has exhibited towards me. He and Dennis Recca's behavior is what has been inappropriate and insubordinate but everything they do to me is alright with you because your goal is to fire me or force me to quit. It is not unreasonable for a neutral third party to be in attendance (HR is not natural), [sic] it is fair under the circumstances. However, since you will not make any attempts to correct engineering management's behavior or remove me from the blatant acts of retaliation as recognized

---

[106] *See* sealed Exhibit 11 attached to Sori's deposition, on file with this court.  It is disputed that Delikat faxed Sori the questionnaire on August 24 and September 1, 2010 because Sori does not recall the document.  *See* doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 4.

[107] Doc. no. 66-15 (Delikat Deposition), at 22.

by OSHA's investigator Ullah who stated that there is retaliation by BM towards me, a neutral third party should be an option. Please know that your continued denial of the existence of discrimination/retaliation does not mean that it is not happening. If I perceive that I am threatened by their behavior and I have let HR know that I feel this way, you are obligated to correct it without threats to terminate me. I have a right to protect myself and I do not think you will find anyone who would disagree.

Therefore, since you are threatening and forcing me to attend, alone and without representation, I will meet with Rick and listen to what he has say with the door open. Since you are not willing to correct managements [sic] behavior or remove me from the mistreatment as requested by my medical provider, I am not willing to be provoked by Rick's demeanor so please know that before I allow him to talk to me inappropriately, as he has done in the past or should the conversation escalate, I will excuse myself.

Thank you,
Tracy Jones-Sanders, EE

Doc. no. 72-5 (Exhibit 5 to Plaintiff's Response), at ECF 4.  Palozzi emailed the

following response:

Tracy,

Liz is currently on vacation. She will respond to your e-mail in detail once she returns next week. However, as you know, the company has thoroughly investigated all of your prior claims of discrimination, hostile work environment and retaliation and in each and every instance has found them to be without merit. Futhmore, [sic] we have never found either Rick Yama or Dennis Recca's behavior to you to be either inappropriate or insubordinate. To the contrary, we have consulted you on multiple occasions and advised you that the conduct you have displayed to your managers was inappropriate and insubordinate.

> It is our understanding that Rick's scheduled meeting with you this afternoon is simply to receive updates on ongoing projects which is within his discretion as your manager. Although you previously indicated that you did not want HR to be a party to this discussion, I will now be attending via telephone. Please feel free to contact me within the next hour if you have any other concerns or questions.
>
> Terry Pallozzi

*Id.* at ECF 3.

On September 13, 2010, Edwards mailed a letter to Sori requesting that she complete the Reasonable Accommodation questionnaire.[108]  Edwards also asked plaintiff to have another medical provider complete the questionnaire if plaintiff was unable to have Sori complete it.[109]  Finally, Benjamin Moore received a note from Toni Roberson, a provider in the same facility as Sori, stating that he "completes FML forms only in relation to work status."[110]

On October 4, 2010, plaintiff sent an email to Edwards and the EEOC stating that she believed she was being discriminated and retaliated against based upon her race and her FMLA leave because Benjamin Moore changed her job duties, prohibited her from the Resin area, and circumvented her communications.[111]  On October 6, 2010, Edwards sent the following email to plaintiff:

---

[108] *See* sealed Exhibit 11 attached to Sori's deposition, on file with this court.

[109] Doc. no. 66-10 (Edwards Deposition), at 81-82.

[110] *See* doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 40.

[111] Doc. no. 72-5 (Exhibit 5 to Plaintiff's Response), at ECF 2.

Dear Tracy,

This is in response to your latest e-mails to me dated September 28 2010 and October 4, 2010. As you're well aware, we have made several attempts to obtain medical documentation in order to assess if there is a need to continue the accommodations already granted to you, as well as to determine whether a different accommodation would be best for you and the company.

You are also aware that we have made several attempts to obtain medical documentation from your medical providers that you have selected. To date, we have not received sufficient information from your providers to confirm your disability and to assess the type of reasonable accommodation you require in order to fulfill the essential functions of your job. To date, the information provided by your medical providers has been as follows:

- **On August 2, 2010 from Pam Sori, your medical provider** - "Tracy is permitted to work her usual duties independently; she should not have sole responsibility for plant support 7 days a weak: such duties should be divided equally."

  Based on this letter, we needed to confirm your ability to fulfill all the essential functions of a Controls Engineer including, but limited to, working with ether employees. We also advised your medical provider that you would not be working independently and would continue to report to your current manager, as well as take direction and work on projects as assigned by your manager.

- **On August 4, 2010 from Pam Sori**, we received a letter stating "Yes" which confirmed our understanding of the August 2nd letter. However, although your doctor confirmed your ability to return to work with full duties, you began to leave regularly for doctor's visits during normal business hours. As a result, your manager rightfully

requested that you provide a doctor's note to confirm your absences.

- **On August 11, 2010 from Pam Sori** - After requesting a doctor's note to substantiate your weekly doctor's visits, your doctor indicated "we don't fax excuses or any patient information over fax". Given this response, you and I exchanged e-mails regarding other ways to provide medica1 documentation (i.e., bring the note with you upon your return to work.)
- **On August 18, 2010 from Pam Sori** - A second return-to-work letter was sent to us. Your doctor recommended that you should continue with the routine of working during the hours from 7:30 AM - 3:30 PM with no on-call responsibilities.

   Since that time this accommodation of having no on-call responsibilities was granted to you. However, as always expressed to you, this accommodation and the right to leave early, every week, were temporary and would be continually re-assessed.

   Beginning August 24, 2010, we asked your doctor to complete the medical questionnaire which will help us assess the continued 1ength of the accommodations afforded to you. After numerous requests, on September 17, 2010, we received a note from Toni Robinson indicating that he ". . . completes FML forms only in relations to work status."

The latest responses from your medical providers are not adequate for us to properly assess the need to continue to grant these accommodations.  Furthermore, it is ultimately your responsibility to ensure that the medical providers, selected by you, provide us with the requested information.

In you most recent e-mails to me dated September 24 and September 28,

71

you have indicated that your disability prevents you from doing your job safely, particularly given your plant support duties. You claim that you need to "<u>remotely</u> control heavy industrial equipment and the dispensing of harmful raw materials at (5) plants." Based on your own assertions, we are very concerned about your ability to perform your job safely. Therefore, effective immediately, we will no longer have you operate the equipment remotely until we fully understand the limitations of your disability from your medical provider.

Furthermore, since your current medical provider has not supplied us with adequate documentation as to when you are under the influence of medication and its possible affects on your abilities to perform the essential job functions, we have removed all automation systems including, but not limited to, PLC/Cimplicity/HMI networks and servers. This will help ensure that we maintain the company's standards for operational excellence and safe working conditions for all employees at the site.

Tracy, at this juncture, it is unclear to Benjamin Moore as to what type and length of accommodation can reasonably address both your needs and those of the company. From the information that we have received directly from you, it appears that there is a continued need for an abbreviated work schedule of approximately 36 hours per week to allow for your weekly doctor visits; a continued need to work within the core set hours of 7:30 AM - 3:30 PM with no on-call responsibilities; and as of the most recent e-mail from you, the need to be excused from performing the essential duties of a Controls Engineer.

Given this current situation, we must receive the completed medical questionnaire from your medical provider by the close of business on **<u>Tuesday, October 12, 2010.</u>**

As I suggested to you in my e-mail dated September 27, 2010, if you are unable to perform the core and essential functions of your role, you are eligible to apply for benefits under the Short-term Disability program administered by Aetna. However, Aetna will also require the necessary certification from your medical provider to determine your disability

status and continued eligibility for Short-term Disability benefits.

In response to your e-mail dated October 4, 2010 regarding your personal request for accommodation, once again, I will summarize the company's position regarding granting you a Flexible Work Arrangement (FWA). You have stated several times that one of your requested accommodations is to have the ability to work from home on a weekly basis. At this time, we are unwilling to grant this request to you for several reasons. First, as we all are aware you were previously under a FWA which allowed you to work from home every Wednesday. As a condition of this arrangement, your manager, Dennis Recca, requested that you maintain an updated calendar showing the projects that were being worked on that day. In spite of your manager's repeated requests, you neglected to adhere to this requirement. Secondly, given what you have now stated regarding your medical condition, we are uncertain whether granting a FWA would ensure that you can adequately and safely perform the core, essential functions of your role.

Lastly, in your most recent e-mails, you suggested that other employees have been granted FWA which has been denied to you and alleged that there is discriminatory and retaliatory practices. Although it would be improper for us to discuss matters regarding other employees with you, we have thoroughly investigated your claim and will share that there is no other employee in the Engineering Department, managed by Dennis Recca, that has been granted the ability to work from home on a weekly basis. As in the past, we take your claims of discrimination quite seriously and have promptly investigated each of them. However, similar to the results of our previous investigations, we have found no evidence that supports your claims of discrimination.

Tracy, as we continually try to support and advise you, it is imperative that we receive the completed medical questionnaire from your medical provider.

Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 24-26 (emphasis in original).

Plaintiff failed to submit the requested documentation by October 12, 2010; as

a result, Edwards recommended, and Marino approved, plaintiff's termination, effective October 14, 2010.[112]

Following her termination, plaintiff sought and received Short-Term Disability benefits through January of 2013.[113] During the application process, plaintiff completed an Aetna Resources Questionnaire in which she stated that she did not anticipate returning to her previous occupation or any other occupation in the near future because she was physically and mentally not able to do so.[114]  On November 2, 2010, Delikat emailed Pallozzi, Edwards, and Zoldessy to inform them: "Aetna has received medical documentation on [plaintiff's Short-term Disability] claim that she filed.  Aetna is obligated to review the medical info that was submitted.  When a decision has been made I will notify you."[115]

On November 4, 2010, OSHA issued a citation to Benjamin Moore for failing to ensure that contractor employees followed safe work practices while changing stainless steel pipes and flanges.[116]

On November 16, 2010, Paul Smith, Benjamin Moore's Payroll Manager, sent an email to John Toman, Benjamin Moore's Payroll Analyst, stating:

---

[112] Doc. no. 66-8 (Marino Deposition), at 16-17.

[113] Doc. no. 66-1 (Plaintiff Deposition), at 17.

[114] Doc. no. 66-2 (Exhibits to Plaintiff Deposition), at ECF 31.

[115] Doc. no. 66-14 (Exhibits to Pallozzi Deposition), at ECF 14.

[116] Doc. no. 72-6 (Exhibit 6 to Plaintiff's Response).

> According to our records [plaintiff] was termed due to "policy violation" — she's currently attempting to collect unemployment benefits; depending on the violation she may not be eligible. Please forward me all documentation pertaining to her termination by Friday, Nov 19th. A hearing has been scheduled with the state for Monday, Nov 22nd.

Doc. no. 66-17 (Exhibits to Smith Deposition), at ECF 34.

From March 31, 2011 through July 15, 2011, Benjamin Moore directly deposited money in plaintiff's bank account.[117] Benjamin Moore later learned that plaintiff received long term disability benefits for the same period, from January 19, 2011 through August 31, 2012, and was not entitled to any additional payment.[118] Generally, the company would ask the employee to repay any overpayment.[119] When Toman called plaintiff to ask for repayment, however, plaintiff refused, stated that she deserved the amount because of her disability claim and that Toman should contact her lawyer, and hung up on him.[120] On August 23, 2011, Mike Farrell sent an email to Kristina Cisneros, stating: "The bulk of the overpayment by us came from April 1 - June 30th we overpaid $18,396 but you can only offset for the $10,740."[121] The

---

[117] Doc. no. 66-2 (Plaintiff Deposition), at 258-60; doc. no. 66-10 (Edwards Deposition), at 121-25; doc. no. 66-15 (Delikat Deposition), at 25. Benjamin Moore contends that the deposit was a salary continuation.

[118] Doc. no. 66-2 (Plaintiff Deposition), at 255-60.

[119] Doc. no. 66-10 (Edwards Deposition), at 124. The parties do not elaborate on who Farrell and Cisneros are, but it appears that Farrell was associated with Benjamin Moore, and Cisneros was associated with Aetna.

[120] Doc. no. 66-18 (Toman Deposition), at 22.

[121] Doc. no. 72-7 (Exhibit 7 to Plaintiff's Response), at ECF 4.

75

next day, Amaya B. Christian, Aetna's Senior OA Analyst, sent the following letter

to plaintiff:

> Dear MS. TRACY JONES SANDERS:
>
> We have recently conducted a review of your LTD claim. Based on our review, we have determined that an overpayment of $16,873.34 gross / net exists.
>
> You have been paid LTD from January 19, 2011 through August 31, 2012. However, we were recently notified that you were also receiving salary continuation from your employer from pay period ending March 31, 2011 through pay period ending July 15, 2011 in the amount of $3,066.67 semi-monthly. Therefore, an overpayment occurred on your claim.
>
> While Aetna recognizes that employees may accidentally or unknowingly be overpaid from these benefit plans, repayment is still required. As such, we are requesting immediate reimbursement.
>
> Please forward a check payable to Aetna in the gross / net amount of $16,873.34, to be received no later than September 08, 2011 to:
>
> Aetna Life Insurance Company
> PO Box 14560
> Lexington, NY 40512-4560
>
> You must respond to this request within 15 days from the date of this letter. Aetna reserves the right to suspend or adjust future benefits until the overpayment is paid in full including possible referral of this matter to a collection agency for handling.
>
> If no payment is received, please be aware, commencing with your September 2011 LTD payment, $3,424.00 will be offset and applied toward the Gross overpayment. This will reduce your monthly benefit amount to $0.00. We will continue to offset your benefits until the overpayment is recovered in full.

Doc. no. 72-7 (Exhibit 7 to Plaintiff's Response), at ECF 5.[122]

The following email correspondence occurred between Farrell and Cisneros in September of 2011:

> **From:** Cisneros, Kristina M . . .
> **Sent:** Wednesday, September 21, 2011 1:36 PM
> **To:** Farrell, Mike
> **Subject:** RE: Disability claim - T. Jones Sanders
>
> Good morning Mike,
>
> I have been asked to confirm if Benjamin Moore will be pursuing repayment of salary continuation from Tracy Jones Sanders.
>
> Thanks,
>
> Kristina
>
> . . .
>
> **From:** Farrell, Mike . . .
> **Sent:** Wednesday, September 21, 2011 10:47 AM
> **To:** Cisneros, Kristina M
> **Subject:** RE: Disability claim - T. Jones Sanders
>
> Hi Kristina,
>
> We will not be pursuing the portion that you will be requesting as part of the overpayment.  Currently, we have no plans to pursue the balance

---

[122] Plaintiff contends that she "objected to this interference in her disability benefits and it was only after retaining legal counsel that Aetna's legal determined that salary continuation is not a valid offset and [she] should be reimbursed." Doc. no. 77-1 (Opposition to Summary Judgment), at 29.  However, she only cites to a facsimile cover sheet, which does not support her assertion. *See* doc. no. 72-9 (Exhibit 9 to Plaintiff's Response).

above what you are recovering but anything could change on the balance.  Mike

. . .

**From:** Cisneros, Kristina M . . .
**Sent:** Thursday, September 22, 2011 1:41 PM
**To:** Farrell, Mike
**Subject:** RE: Disability claim - T. Jones Sanders

would you be able to have a letter sent to the employee advising her as such?

Kristina

. . .

**From:** Farrell, Mike . . .
**Sent:** Thursday, September 22, 2011 2:00 PM
**To:** Cisneros, Kristina M
**Subject:** RE: Disability claim - T. Jones Sanders

I am sorry but we will not be doing that at all.  What I indicated to you is just for Aetna to pursue the overpayment as per the Plan.  Mike

Doc. no. 72-7 (Exhibit 7 to Plaintiff's Response), at ECF 4.

In November of 2012, Laura L. Seeman, Division Chief for the Field Operations Office of the Whistleblower Protection Program at the U.S. Department of Labor sent the following letter to plaintiff:

RE:   Benjamin Moore Paints/Jones-Sanders/4-0350-11-004

Dear Ms. Jones-Sanders:

This is in response to your appeal of the decision to dismiss your complaint against Benjamin Moore Paints filed on December 2, 2011. We have completed a comprehensive review of the entire investigative case file and have determined that Benjamin Moore Paints did not violate Section 11(c) of the Occupational Safety and Health Act of 1970. The preponderance of the evidence failed to support that your employment was terminated because of your engagement in protected activity.

Please note that this is the final determination of the Secretary of Labor; your case is now closed.

Sincerely,

Laura L. Seeman

Doc. no. 66-2 (Exhibits to Plaintiff Deposition), at ECF 33.

## III.  MOTION TO STRIKE

Benjamin Moore contends that portions of plaintiff's evidentiary submission in opposition to summary judgment, including exhibits 2, 3, 4, and 6, should be struck because plaintiff failed to authenticate them, and they contain irrelevant information, opinion testimony, and inadmissible hearsay.[123]  Plaintiff argues that a motion to strike is only appropriate as to pleadings, and not to evidentiary submissions outside the pleadings.[124]  *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.").  The law is not entirely clear on whether a court has broad powers to strike

---

[123] Doc. no. 76 (Motion to Strike), at 1.

[124] Doc. no. 79 (Opposition to Motion to Strike), at 3.

evidence or other non-pleadings, or if a court's power to strike is limited by Rule 12(f) to the pleadings. *Compare Reese v. Herbert*, 527 F.3d 1253, 1265, 1274 (11th Cir. 2008) (affirming district court's grant of a motion to strike an affidavit), *with Polite v. Dougherty Cnty. Sch. Sys.*, 314 F. App'x 180, 184 n.7 (11th Cir. 2008) ("motions to strike are only appropriately addressed towards matters contained in the pleadings"). In any event, Federal Rule of Civil Procedure 56 provides: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Thus, "[a]lthough the form of the [motion to strike] is not grounded in a federal procedural rule, the substance of the motion[] will be considered." *Stuckey v. Alabama Bd. of Pardons and Paroles*, 2:11-cv-112-WKW, 2012 WL 3670644, *1 n.2 (M.D. Ala. Aug. 27, 2012). Accordingly, Benjamin Moore's Motion to Strike is due to be denied; however, the court will consider the substance of the motion in deciding the Motion for Summary Judgment.

With respect to the issue of authenticity, Benjamin Moore argues that a document must be authenticated by, and attached to, an affidavit that meets the requirements of Rule 56(e) before the court can consider it at summary judgment.[125] In support of its argument, Benjamin Moore cites *Saunders v. Emory Healthcare,*

---

[125] Doc. no. 76 (Motion to Strike), at 2.

*Inc.*, 360 F. App'x. 110, 113 (11th Cir. Jan. 11, 2010).  However, "[t]he *Saunders* opinion does not govern this issue because Rule 56 was amended in 2010.  Under the 2010 amendment, which became effective on December 1, 2010, authentication of documents no longer is required at the summary judgment stage."  *Agee v. Chugach World Services, Inc.*, 5:12-cv-2119-MHH, 2014 WL 5795555, *5 (N.D. Ala. Sept. 30, 2014) (citing *Abbott v. Elwood Staffing Servs., Inc.*, 1:12-cv-2244-VEH, 2014 WL 3809808 (N.D. Ala. July 31, 2014) ("The majority of the opinions this Court has read from courts construing current Rule 56, however, state the amendments eliminated the authentication requirement and replaced it with a requirement that evidence be presentable in admissible form at trial.")).

Under current Rule 56(c), "the inquiry is whether the exhibit can be submitted in a form that will be admissible in evidence."  *Agee*, 2014 WL 5795555, at *5.  Federal Rule of Evidence 901 provides:

> **(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

> **(b) Examples.** The following are examples only — not a complete list — of evidence that satisfies the requirement:

>> **(1) Testimony of a Witness with Knowledge.** Testimony that an item is what it is claimed to be. . . .

>> **(7) Evidence About Public Records.** Evidence that:

81

**(A)** a document was recorded or filed in a public office as authorized by law; or

**(B)** a purported public record or statement is from the office where items of this kind are kept.

Fed. R. Evid. 901. Plaintiff has submitted a declaration in an attempt to authenticate her summary judgment exhibits.[126]  Plaintiff asserts that exhibit 2 is Benjamin Moore's organization charts, and that the handwriting is her own.[127]  She asserts that exhibit 3 is a composite exhibit containing print-previews from Benjamin Moore's Performance Manager System, which she had access to, and that the handwriting was her own.[128]  She asserts that exhibit 4 is a business directive she received on August 24, 2010 during her employment.[129]  Finally, she asserts that exhibit 6 is a copy of documents from the United States Department of Labor.[130]  Benjamin Moore contends, for a variety of reasons, that plaintiff's declaration is insufficient.[131]  Based upon the declaration, however, the court is satisfied that plaintiff could authenticate the exhibits at trial.

---

[126] *See* doc. no. 79-1 (Plaintiff Declaration).

[127] Doc. no. 79-1 (Plaintiff Declaration), ¶ 2.

[128] *Id.* ¶¶ 5-7.

[129] *Id.* ¶ 11.

[130] *Id.* ¶ 12.

[131] Doc. no. 80 (Reply in Support of Motion to Strike), at 5.  Benjamin Moore also contends that plaintiff's declaration is untimely and prejudicial because it was filed *after* the parties submitted their summary judgment briefs.  Because there is no requirement that the exhibits be authenticated at summary judgment, and because plaintiff's declaration *is* timely for purposes of the motion to strike, the court will not consider those contentions.

Benjamin Moore next contends that plaintiff's exhibits are irrelevant in violation of Federal Rule of Evidence 402 and that they contain improper opinion testimony in violation of Federal Rule of Evidence 701 because there is no evidence presented as to who wrote the notations on the exhibits, whether the author is plaintiff, what specific issues the notations pertain to, or to whom the notations were written.[132]   Regarding the relevance of the exhibits, Benjamin Moore's contention is trivial.   If the exhibits are irrelevant, the court will simply not consider them on summary judgment.   Regarding the issue of improper opinion testimony, plaintiff clarifies that she wrote the handwritten notations in the exhibits.[133]   Upon review of plaintiff's various submissions in opposition to summary judgment, it appears that plaintiff is not relying on her handwritten notations to oppose summary judgment. Thus, the court will not consider plaintiff's handwritten notations.

Benjamin Moore finally contends that plaintiff's exhibits constitute inadmissible hearsay because they contain written assertions of a person made in a non-testimonial environment.[134]   However, Benjamin Moore does not cite to any specific written assertion that it contends is inadmissible hearsay.   Without such guidance, the court cannot make a determination regarding whether any specific

---

[132] Doc. no. 76 (Motion to Strike), at 6.

[133] *See* doc. no. 79-1 (Plaintiff Declaration), ¶¶ 2, 7.

[134] Doc. no. 76 (Motion to Strike), at 7.

statement is being offered to prove the truth of the matters asserted.

## IV.  DISCUSSION OF MOTION FOR SUMMARY JUDGMENT

**A.  Claims Subject to the *McDonnell Douglas* Framework**

Plaintiff's discrimination claims are asserted under Title VII and 42 U.S.C. § 1981.[135]  "Both of these statutes have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The essential element under each statute is proof that the employer intentionally inflicted the adverse employment action complained of because of the plaintiff's race.  *See, e.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767 (11th Cir. 2005) (observing that disparate treatment claims based upon a plaintiff's race and "brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent").  Thus, the court will consider plaintiff's Title VII and § 1981 racial discrimination claims together.  Additionally, retaliation claims asserted under Title VII, § 1981, and the FMLA have the same burden of proof. *Penaloza v. Target Corp.*, 549 F. App'x 844, 847-48 (11th Cir. 2013).  Thus, the court will likewise consider plaintiff's Title VII, § 1981, and FMLA retaliation claims together.

Plaintiff attempts to establish Benjamin Moore's discriminatory and retaliatory

---

[135] Doc. no. 37 (Third Amended Complaint), ¶ 1.

intent through the use of circumstantial evidence.[136]   Federal courts evaluate the

sufficiency of such evidence using some variant of the analytical framework

announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*,

450 U.S. 248 (1981).  *See also, e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502

(1993); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2004) (*en banc*);

*Berman v. Orkin Exterminating Co., Inc*., 160 F.3d 697, 701 (11th Cir. 1998); *Bigge*

*v. Albertsons, Inc*., 894 F.2d 1497, 1501 (11th Cir. 1990).   Under that familiar

framework, a plaintiff must first establish a *prima facie* case of disparate treatment

or retaliation, which creates a presumption of discrimination or retaliation.  To rebut

that presumption, the employer must articulate a legitimate, nondiscriminatory and

nonretaliatory reason for the contested employment action.  If the employer does so,

the presumption of discrimination or retaliation drops from the case, and the burden

shifts back to the plaintiff to show that the employer's proffered reason is merely a

pretext for unlawful discrimination or retaliation.  *See, e.g*., *McDonnell Douglas*, 411

U.S. at 802–05; *Burdine*, 450 U.S. at 252–56.

## 1.     Prima Facie Case of Discrimination

Plaintiff bases her discrimination claims upon the following employment

---

[136] *See* doc. no. 15 (Response to Summary Judgment Motion), at 11.

actions: her increased workload (including the denial of her request for help with her workload); the removal of her FWA privileges; the requirement that she attend weekly meetings with Recca; Recca's criticism of plaintiff's calendar entries; plaintiff's exclusion from engineering communications (and her subsequent humiliation); Pallozzi's comments that plaintiff was "insubordinate;" her negative performance evaluation; Benjamin Moore's failure to promote plaintiff to the Senior Controls Engineer position; and plaintiff's termination.[137]

To establish a prima facie case of race-based discrimination, plaintiff must show that: (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) the employer replaced her with someone outside his protected class or otherwise treated similarly situated employees outside his protected class more favorably, and (4) she was qualified to perform the duties of his job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984).

Benjamin Moore contends that many of the acts plaintiff complains of were not

---

[137] Doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 32-34. Plaintiff also contends that these acts should be considered collectively in determining whether they were adverse employment actions. *Id.* at 31. However, aggregate consideration to determine adversity appears to only apply to retaliation claims, and discrimination claims based upon a hostile working environment. The court will consider each act discretely in discussing plaintiff's discrimination claims based upon her race.

"adverse employment actions" under the discrimination statutes.[138]

> Not all employer actions that negatively impact an employee qualify as "adverse employment actions." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). Rather, only those employment actions that result in "a serious and material change in the terms, conditions, or privileges of employment" will suffice. *Id.* at 1239 (emphasis in original). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

*Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). Thus, plaintiff must "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing, *inter alia*, *Davis*, 245 F.3d at 1239).

An "ultimate employment decision" is one "such as termination, failure to hire, or demotion." *Id.* For a decision "falling short of an ultimate employment decision" to rise to the level of an actionable adverse employment action, that decision "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Id.* (internal quotations and citation omitted). Among the facts and circumstances affecting whether a decision

---

[138] Doc. no. 65 (Brief in Support of Summary Judgment), at 24-28.

is considered "adverse" are whether the decision results in "lesser pay, responsibilities or prestige," and whether the decision would "impede an employee's professional growth or advancement." *Doe v. DeKalb County School District*, 145 F.3d 1441, 1452 (11th Cir. 1998). "Although proof of direct economic consequences is not required in all cases, the asserted impact 'cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.'" *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009) (quoting *Filius v. Potter*, 176 F. App'x 8, 10 (11th Cir. 2006)). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (internal quotations and citations omitted).

Benjamin Moore specifically argues that plaintiff's increased workload, the purported "nitpicking" she endured, plaintiff's exclusion from engineering communications, and her negative performance evaluation does not constitute adverse employment actions.[139]   The court agrees, in part.[140]   There is no evidence that the

---

[139] *Id.* at 25-28.

[140] The court is skeptical that plaintiff's increased workload — including the addition of on-call responsibility — amounted to the "unusual instance" where the increase was "so substantial and material that it [did] indeed alter the 'terms, conditions, or privileges' of employment." *See Davis,*

88

purported "nitpicking" plaintiff endured (such as the requirement that plaintiff attend weekly meetings with Recca, Recca's criticism of plaintiff's calendar entries, and Pallozzi's comments that plaintiff was "insubordinate"), or the purportedly negative performance review affected the terms, conditions, or privileges of plaintiff's employment. *See, e.g., Austin v. City of Montgomery*, 196 F. App'x 747, 753 (11th Cir. 2006) (counseling memos not adverse employment actions because plaintiff failed to show that memos were "a formal reprimand or triggered any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities, or more formal discipline"); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 ("Negative performance evaluations, standing alone, do not constitute adverse employment action.").[141]   Although plaintiff may have been unhappy with this conduct, it does not constitute an adverse employment action. *See Smart*, 89 F.3d at

---

245 F.3d at 1244.  Further, while the court recognizes that plaintiff's exclusion from meetings may be an adverse employment action where she suffered the denial of a promotion, *see Rogers-Libert v. Miami–Dade Cnty.*, 184 F. Supp. 2d 1273, 1285-86 (S.D. Fla. 2001) (finding that plaintiff's exclusion from meetings was not an adverse employment action because she suffered no "loss in salary or benefits, subsequent denial of promotions, workplace reassignment, transfer or change in her permanent job title"), the court is likewise skeptical that plaintiff's exclusion from engineering communications resulted in the specific communication issues that caused her promotion denial.  Still, the court will not reach these issues at this time, because it can dispose of them when determining whether Benjamin Moore's articulated reasons for plaintiff's increased workload and exclusion from engineering communications was pretextual.

[141] Although the parties dispute whether the 2009 performance evaluation was "negative," it occurred *after* plaintiff was not selected for the Senior Controls Engineer position, and it did not contribute to her termination.  Thus, there is no evidence that it resulted in any changes to the terms, conditions, or privileges of plaintiff's employment.

441.

Thus, the only conduct for which plaintiff may be able to establish a *prima facie* case of discrimination are: her increased workload; her exclusion from engineering communications; the removal of her FWA privileges; Benjamin Moore's failure to promote plaintiff to the Senior Controls Engineer position; and plaintiff's termination.

## 2.   *Prima Facie* **Case of Retaliation**

Plaintiff bases her retaliation claims upon the same employment actions as her discrimination claims.[142]   A plaintiff generally must prove three elements to establish a prima facie case of retaliation: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

Benjamin Moore first argues the alleged "nitpicking" plaintiff endured, and her 2009 performance evaluation, do not constitute materially adverse actions.[143]   The court agrees.   To satisfy the adverse action prong, plaintiff "must show that a

---

[142] *See* doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 30-33.  Additionally, plaintiff contends that the complained-of conduct should be considered individually and collectively. *See id.* at 31.   However, a retaliation claim based upon the aggregate conduct is, actually, a retaliatory hostile work environment claim.  *See, e.g., Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012).  The court addresses plaintiff's retaliatory hostile work environment claims later.

[143] Doc. no. 65 (Brief in Support of Summary Judgment), at 36.

reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). However, in speaking of material adversity, the Court felt it "important to separate significant from trivial harms." *Id.* Based upon this guidance, it is clear that the "nitpicking" (*i.e.*, the requirement that plaintiff attend weekly meetings with Recca, Recca's criticism of plaintiff's calendar entries, and Pallozzi's comments that plaintiff was "insubordinate") amounts to trivial harms. Further, although a negative performance evaluation may be materially adverse in some circumstances, it is not in this case. In light of plaintiff's positive overall score in her performance evaluation (which was consistent with her 2007 and 2008 performance reviews), and the constructive nature of the purportedly negative comments which were accompanied by positive comments, plaintiff's 2009 performance evaluation falls squarely in the trivial versus significant harm category the Supreme Court cautioned courts to refrain from finding materially adverse. *Id.* at 68; *see, e.g., Forbes v. City of North Miami*, No. 11-21200-CIV, 2012 WL 1135820, *12 (S.D. Fla. Apr. 4, 2012) ("A critical review of an employee's work product in and of itself would not deter a reasonable employee from making or supporting a charge of discrimination. On the contrary, a reasonable employee who

received numerous warnings about his work product may be more inclined to expect such a review.").  Accordingly, plaintiff's prima facie of retaliation based upon the "nitpicking" and her 2009 performance evaluation fails.

Next, Benjamin Moore contends that there is no causal connection between plaintiff's protected activity and the removal of her FWA and her termination.[144] Specifically, defendant notes that plaintiff's FWA was removed seven months after she amended her charge of discrimination, and her employment was terminated nine months after she amended her charge of discrimination.[145]  Generally, a plaintiff can satisfy the causation prong by "prov[ing] that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Assocs.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal citation and quotation mark omitted). This is satisfied when the plaintiff "provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).

In this case, the delay between plaintiff's amended charge of discrimination and the removal of her FWA and termination is too remote to establish a causal connection by itself.  *See  Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)

---

[144] Doc. no. 65 (Brief in Support of Summary Judgment), at 37.

[145] *Id.*

(four month delay between protected activity and adverse action insufficient to establish a causal connection without other evidence).  However, plaintiff has presented sufficient evidence that she engaged in a Title VII protected activity immediately prior to her FMLA leave.  Specifically, plaintiff's April 29, 2010 letter to Pallozzi complained about unlawful discrimination, and was protected by  the "opposition clause" of Title VII.  *See E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) ("Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'") (quoting 42 U.S.C. § 2000e–3(a)); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) ("To establish that a plaintiff engaged in statutorily protected expression, we have held that a plaintiff must show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'") (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).[146]  Accordingly, plaintiff can establish a prima facie case of retaliation under Title VII based upon the removal of her FWA and termination.[147]

Thus, the only conduct for which plaintiff may be able to establish a *prima*

---

[146] *See* doc. no. 66-13 (Exhibits to Pallozzi Deposition), at ECF 21.

[147] Additionally, there is a sufficient causal connection between her protected FMLA activity and the termination of her FWA and employment to establish a prima facie case of FMLA retaliation.

93

*facie* case of retaliation are her increased workload, her exclusion from engineering communications, Benjamin Moore's failure to promote plaintiff, the removal of her FWA, and her termination.

### 3. Pretext

In light of plaintiff's *prima facie* case of racial discrimination and retaliation based upon plaintiff's increased workload, her exclusion from engineering communications, Benjamin Moore's failure to promote her to the Senior Controls Engineer position, the removal of plaintiff's FWA, and the termination of plaintiff's employment, the burden shifts to Benjamin Moore to articulate a non-discriminatory and non-retaliatory reason for its actions. Benjamin Moore asserts several reasons for its various employment decisions. First, the company contends that plaintiff's workload increased as a result of the 2008 RIF and subsequent staff shortages. Second, the company contends that plaintiff's exclusion from engineering communications was because many of the engineers Recca communicated with outside of plaintiff's presence were located with Recca in Flanders, New Jersey, and Recca encountered them more often than he encountered plaintiff. Third, the company asserts that plaintiff's FWA was removed due to her failure to abide by her manager's instructions to properly update her calendar entries. Fourth, the company asserts that plaintiff was not promoted to the Senior Controls Engineer positions

because: "(1) she had shown a lack of leadership skills resulting from her inability to communicate appropriately with her managers; (2) Yama had significantly more management experience and more recent experience; and (3) Yama had a more extensive background in both chemical engineering and controls."[148]   Finally, Benjamin Moore asserts that Marino terminated plaintiff because she failed to provide a completed questionnaire from her medical provider after repeated requests. According to the company, the essential functions of plaintiff's position required on-call responsibilities, and, after multiple attempts to obtain information regarding the expected length of accommodations from Sori, Benjamin Moore instructed plaintiff to obtain the information.

These reasons initially satisfy Benjamin Moore's burden under the *McDonnell Douglas* framework because Benjamin Moore "need only produce evidence that could allow a rational fact finder to conclude that [the adverse actions were] not made for a discriminatory [or retaliatory] reason." *Standard*, 161 F.3d at 1331. "In light of this, [plaintiff] must now create a genuine issue of material fact as to whether the reasons advanced are pretextual. In other words, [plaintiff] must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for" the various adverse employment actions. *Id.* at 1332;

---

[148] Doc. no. 65 (Brief in Support of Summary Judgment), at 30.

*see Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citations omitted) ("The district court must evaluate whether [plaintiff] has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Benjamin Moore's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.").

Plaintiff offers no evidence or argument to rebut Benjamin Moore's articulated reasons for her increased workload and exclusion from engineering communications. Indeed, plaintiff was the only controls engineer after the RIF, and the only engineer located at Benjamin Moore's Pell City facility.  In fact, plaintiff does not dispute that "[t]he RIF required employees across the company to take on additional responsibilities of those employees who had been terminated in the reduction or who chose to leave the company in the face of the reduction,"[149] or that she "was not present at the same facility during the alleged communications that Recca had with other engineers."[150]  For these reasons, summary judgment is due to be granted as to plaintiff's claims of discrimination and retaliation based upon her increased workload and exclusion from engineering communications.

Plaintiff does, however, attempt to establish pretext regarding Benjamin

---

[149] Doc. no. 65 (Brief in Support of Summary Judgment), at 4, ¶ 21; doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 0.

[150] Doc. no. 65 (Brief in Support of Summary Judgment), at 9-10, ¶ 54; doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 2.

Moore's articulated reasons for removing her FWA, failing to promote her to the Senior Controls Engineer position, and terminating her.[151]  The court addresses these employment actions in turn below.

> i.      *Removal of Plaintiff's FWA*

Plaintiff contends that Benjamin Moore's articulated reason for removing her FWA was pretextual because her calendar issues were from the previous year, and Benjamin Moore waited until after she returned from FMLA leave to terminate her FWA.[152]  Initially, the court notes that plaintiff disputed her calendar issues (the asserted reason her FWA was terminated) based upon Recca's letter stating: "When in attendance at your regular work location no [calendar] entry required."[153]  However, Recca still required plaintiff to keep an updated calendar regarding the projects assigned while she worked from home (*i.e.*, not her regular work location), and Recca's letter was sent months before a new FWA was granted requiring plaintiff "to get a detailed calendar listing of the projects and tasks being worked on."[154]

Plaintiff also disputes her calendar issues because, in response to an email from Recca telling plaintiff there were gaps for 8 hours of planned or actual activity in her

---

[151] *See* doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 34-37, 40-43.

[152] *Id.* at 41-42.

[153] Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 10; doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 2.

[154] Doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 10.

calendar, she stated: "You have to open the WFH to see the day's agenda/activity, I save the actual time slots for actual appointments."[155]  However, Recca sent another email later stating:

> The point of calendar entries is to reflect as close as possible your WFH work schedule.  You have just duplicated the same itinerary on every planned WFH day including over your vacation.  Your calendar does reflect the full 8 hour schedule as we have discussed but it should vary each week depending on your priorities.

Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 20.  Although plaintiff's email does support the fact that she updated her calendar, it does not address the specific issues plaintiff was having with updating her calendar (*i.e.*, that plaintiff was simply copying the same schedule, and was not updating her calendar based on what she was *actually* prioritizing for that day).  Thus, it is undisputed that plaintiff *was* having calendar issues in 2009.

It is peculiar, however, that Benjamin Moore terminated plaintiff's FWA only *after* her return from FMLA leave, as opposed to at any point in the previous year. Based on the significant temporal gap between Benjamin Moore's decision to terminate plaintiff's FWA and plaintiff's initial calendar issues (over a year), and the close temporal proximity between said decision and plaintiff's return from FMLA leave (only a few days), a jury could conclude that the calendar issues were a pretext

---

[155] Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 18.

for retaliating against plaintiff for taking FMLA leave.

        *ii.    Failure to Promote Plaintiff*

      Plaintiff contends that Benjamin Moore's articulated reasons for failing to promote her to the Senior Controls Engineer position were pretextual because Yama was not qualified for the position, and Benjamin Moore cannot produce a single discipline showing that plaintiff was insubordinate.[156] The court disagrees. Plaintiff's primary reason for contending that Yama was not qualified for the position is because "[t]he job requirements include 'BS degree in Electrical Engineering or Electronic Engineering Technology' which Yama does not have."[157] However, plaintiff omits a material portion of the required qualifications for the Senior Controls Engineer position: that the applicant have experience equivalent to a BS degree in Electrical Engineering or Electronic Engineering Technology.[158] Yama had experience in controls engineering, as well as thirty-four years of management experience — certainly meeting the "equivalent experience" requirement in lieu of a degree in Electrical Engineering or Electronic Engineering Technology.

      Plaintiff also directs the court's attention to Recca's testimony regarding

---

[156] Doc. no. 77-1 (Brief in Opposition to Summary Judgment), at 35-36.

[157] *Id.* at 35 (quoting doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 37).

[158] Doc. no. 66-7 (Exhibits to Recca Deposition), at ECF 37.

Yama's qualifications.[159]  However, it was Marino, not Recca, who was the ultimate decision-maker in this case.  The fact that Recca did not know what qualifications Yama possessed is irrelevant in light of Marino's testimony.[160]

Finally, plaintiff's contention that she was never disciplined for insubordination is also irrelevant, considering the voluminous amounts of evidence demonstrating her inability to communicate effectively with her superiors (*i.e.*, one of the articulated reasons Benjamin Moore gave for choosing Yama over plaintiff).[161] In short, there is no evidence that Marino's reasons for selecting Yama over plaintiff for the Senior Controls Engineer position were pretextual.

### iii.   Termination

Plaintiff initially contends that Benjamin Moore's articulated reason for terminating her was pretextual because she was not sent the reasonable accommodation questionnaire until after September 13, 2010.[162]  However, regardless of whether plaintiff was sent the questionnaire at the time Benjamin Moore initially attempted to contact Sori, plaintiff testified that she received it around the time it was

---

[159] Doc. no. 77-1 (Brief in Opposition to Summary Judgment), at 35.

[160] Doc. no. 66-8 (Marino Deposition), at 25-26.

[161] *See, e.g.,* doc. no. 66-3 (Exhibits to Plaintiff Deposition), at ECF 38; doc. no. 66-12 (Exhibits to Pallozzi Deposition), at ECF 38-41; doc. no. 66-1 (Plaintiff Deposition), at 116-17; doc. no. 66-11 (Exhibits to Edwards Deposition), at ECF 17-21.

[162] Doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 43.

sent to her on September 13, 2010.[163]  That means that plaintiff had possession of the questionnaire when Edwards sent the October 6, 2010 letter instructing plaintiff to have her medical provider complete the questionnaire and return it before October 12, 2010, or risk termination.[164]  Plaintiff's failure to receive the questionnaire prior to the Edwards's letter does not evidence pretext because it is consistent with the company's efforts to have the questionnaire completed by plaintiff's medical providers.  In other words, the company attempted to have Sori complete the questionnaire on its on, and when she would not, they instructed plaintiff to have Sori complete it.  Thus, plaintiff was given ample opportunity to have Sori compete the questionnaire and return it to Benjamin Moore, and the company's reasons for terminating plaintiff were not pretextual based upon the timing of Edwards's letter and plaintiff's receipt of the questionnaire.

Next, plaintiff contends that there is pretext because there is a genuine dispute regarding whether plaintiff's on-call responsibilities were "essential."[165]  Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" for "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. §

---

[163] *See* doc. no. 66-2 (Plaintiff Deposition), at 216.

[164] Doc. no. 66-4 (Exhibits to Plaintiff Deposition), at ECF 24-26

[165] Doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 43.

2612(a)(1)(D).  An employee is unable to perform the functions of her position if she

is "unable to work at all or . . . unable to perform any one of the essential functions

of the employee's position."  29 C.F.R. § 825.123.

> Following such leave, an employee is entitled to return to her
> position or its equivalent unless she "is unable to perform an essential
> function of the position because of a physical or mental condition,
> including the continuation of a serious health condition." 29 C.F.R. §§
> 825.214, 825.216(c).  An essential function is a "fundamental job dut[y]
> of the [plaintiff's] employment position," as evidenced by the
> employer's judgment, written job descriptions, the amount of time spent
> performing the function, and the consequences of allowing the plaintiff
> not to perform the function.  *See* 29 C.F.R. § 1630.2(n)(1), (3).

*Grace v. Adtran, Inc.*, 470 F. App'x 812, 815-16 (11th Cir. 2012).

The court is satisfied that there is no genuine dispute regarding whether on-call

responsibilities were an "essential function" of plaintiff's position.  Although her

written job description did not originally include on-call responsibilities, plaintiff

assumed those responsibilities following the RIF, and maintained them for almost two

years up until her return from FMLA leave, when Benjamin Moore temporarily re-

assigned them in an effort to temporarily accommodate plaintiff.  In fact, Benjamin

Moore made it clear that the accommodation would be temporary, and that plaintiff

was expected to resume on-call responsibilities eventually.  Edwards noted that

"although [on-call responsibilities are] not specifically highlighted in the Job

Description, it's a responsibility that was communicated to you in the past and we

foresee On-Call coverage continuing to be a part of this job responsibility in the future."[166]  It is disingenuous for plaintiff to claim that on-call responsibilities were not essential when, for two years, she attempted to have Benjamin Moore reassign the duties, but the company never did (*i.e.*, it was necessary that plaintiff, the only Controls Engineer for almost two years, perform these duties).  Based upon these facts, plaintiff cannot establish that Benjamin Moore's articulated reason for terminating her was pretextual because her job duties were not actually "essential."

For the aforementioned reasons, summary judgment is due to be granted as to plaintiff's discrimination and retaliation claims based upon the purported "nitpicking," plaintiff's 2009 performance evaluation, her increased workload, her exclusion from engineering communications, Benjamin Moore's failure to promote plaintiff, and plaintiff's termination.  Summary judgment is due to be denied as to plaintiff's discrimination and retaliation claims based upon the removal of her FWA.

## B.   **FMLA Interference**

To establish an interference claim under the FMLA, "an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008).  Plaintiff contends that Benjamin Moore interfered with her right to reinstatement

---

[166] Doc. no. 66-5 (Exhibits to Plaintiff Deposition), at ECF 34-35.

under the FMLA by changing her core hours, removing her FWA, re-imposing her on-call responsibilities, and instituting bi-weekly meetings with Yama.[167]  After an employee's qualifying FMLA absence, a covered employer must reinstate the employee to his or her former position or an alternate one with equivalent pay, benefits, and working conditions. 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.214.  The Eleventh Circuit has concluded, however, that an employee who is unable to perform an essential job function is not entitled to reinstatement upon returning from FMLA leave.  *See Grace*, 470 F. App'x at 816 ("Because Grace was still restricted from lifting more than 10-pounds at the end of her FMLA leave, she remained unable to perform an essential function of her position and, thus, was unentitled to return to her position.").  As previously determined, on-call responsibilities were an essential function of plaintiff's employment position.[168]  Plaintiff has admitted that she was unable to perform on-call responsibilities following her 12 weeks of FMLA leave.  Accordingly, she was not entitled to reinstatement, and Benjamin Moore did not interfere with her FMLA rights by removing her FWA following her return.

## C.    Retaliatory Hostile Work Environment

Benjamin Moore barely addresses plaintiff's retaliatory hostile work environment claim.  The company argues that the underlying acts were discrete and

---

[167] Doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 41.

[168] *See supra* Part IV.A.

104

cannot form the basis of a hostile work environment claim, and that the underlying acts were not objectively and subjectively severe and pervasive.[169]  Benjamin Moore presents no discussion or analysis regarding its contentions; it only states, in conclusory fashion, that the underlying acts were discrete, and were not objectively and subjectively severe and pervasive such that plaintiff could establish a prima facie case.   The court will not entertain those contentions without any substantive argument.

## D.      State-Law Claims

Benjamin Moore contends that plaintiff's claims of negligent or wanton supervision must be dismissed because plaintiff cannot prove that the company committed an underlying Alabama common-law tort.[170]  The court agrees.   *See Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) ("In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort.") (citing *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999)).   Plaintiff does not offer any argument to dispute this contention.   Accordingly, plaintiff's state law claims of negligent or wanton supervision are due to be dismissed.

---

[169] Doc. no. 65 (Brief in Support of Summary Judgment), at 38 n.12.

[170] Doc. no. 65 (Brief in Support of Summary Judgment), at 44 n.14.

## E.    Unjust Enrichment

Benjamin Moore contends that it is entitled to summary judgment on its unjust enrichment counterclaims.[171]   "[T]o prevail on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff." *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006); *see also Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011) ("To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation.") (citations omitted).  Enrichment may be "unjust" for purposes of this doctrine if "the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty." *Mantiply*, 951 So. 2d at 654-55.[172]   According to Benjamin Moore, plaintiff received a salary continuation and long term disability benefits for the same time period, resulting in an overpayment of $24,533.36.[173]   Plaintiff

---

[171] Doc. no. 65 (Brief in Support of Summary Judgment), at 44.

[172] The court analyzes Benjamin Moore's claim of unjust enrichment under Alabama law because Benjamin Moore argued that it was entitled to a judgment as a matter of law based on Alabama law.  *See* doc. no. 65 (Brief in Support of Summary Judgment), at 44 (citing *Bell Aerospace Servs. v. U.S. Aero Servs., Inc.*, 690 F. Supp. 2d 1267, 1265 (M.D. Ala. 2010) (analyzing unjust enrichment claim under Alabama law).  However, Benjamin Moore's counterclaim asserts that its unjust enrichment claim is brought pursuant to federal common law.  Since the court is not granting summary judgment in favor of Benjamin Moore on its unjust enrichment claim, the court will address this discrepancy later.

[173] Doc. no. 65 (Brief in Support of Summary Judgment), at 45.

contends that the salary continuation was not a mistake, but was retaliatory in order to cause Aetna to suspend plaintiff's long term disability benefits.[174]   Plaintiff's contention is based on speculation.   She has not cited any evidence that the overpayment was anything more than a mistake.   Even so, the court cannot discern exactly how much plaintiff owes Benjamin Moore for the deposits, and it is unsure of how Benjamin Moore arrived at the value of $24,533.36.   Accordingly, the court will deny Benjamin Moore's motion for summary judgment on its unjust enrichment claims.

## IV.  CONCLUSION

For the aforementioned reasons, Benjamin Moore's motion for summary judgment is due to be DENIED as it relates to the company's counterclaims, plaintiff's retaliatory hostile work environment claim, and her discrimination and retaliation claims pursuant to Title VII, § 1981, and the FMLA, based upon the company's removal of plaintiff's FWA.  The motion is due to be GRANTED in all other respects.  The defendant's motion to strike plaintiff's evidentiary submission in opposition to summary judgment is due to be GRANTED IN PART and DENIED IN PART.  A separate order, consistent with this memorandum opinion, will be entered contemporaneously herewith.

---

[174] Doc. no. 71-1 (Brief in Opposition to Summary Judgment), at 44-45.

**DONE**, this the 31st day of March, 2015.

_____

**JOHN E. OTT**
Chief United States Magistrate Judge